```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF TEXAS
 2                   TYLER DIVISION

 3
   ADJUSTACAM, LLC                )
 4                                    DOCKET NO. 6:10cv329
      -vs-                        )
 5                                    Tyler, Texas
                                 )  1:45 p.m.
 6 AMAZON.COM, INC., ET AL          June 26, 2013

 7

 8            TRANSCRIPT OF MOTIONS HEARING
           BEFORE THE HONORABLE LEONARD DAVIS,
 9         UNITED STATES CHIEF DISTRICT JUDGE

10                A P P E A R A N C E S
11

12    (SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES OF THE

13                        HEARING.)

14                        * * * * *

15                        SPEAKERS

16
   FOR THE PLAINTIFFS:
17
   MR. ANDREW SPANGLER
18 MR. JOHN EDMONDS

19
   FOR THE DEFENDANTS:
20
   MR. JOHN ZARAIN
21 MR. TREY YARBROUGH
   MR. EZRA SUTTON
22

23 COURT REPORTER:       MS. SHEA SLOAN
                        shea_sloan@txed.uscourts.gov
24
   Proceedings taken by Machine Stenotype; transcript was
25 produced by a Computer.
```

```
 1                   P R O C E E D I N G S
 2              THE COURT:  Please be seated.
 3              All right.  Ms. King, if you will call
 4  the case, please.
 5              THE CLERK:  Court calls Case No.
 6  6:10cv329, AdjustaCam, LLC v. Amazon.com, Inc., et al.
 7              THE COURT:  All right.  Announcements.
 8              MR. SPANGLER:  Your Honor, good
 9  afternoon.  Andrew Spangler on behalf of the plaintiff.
10              With me today is Ms. Erica Barnes, Mr.
11  John Edmonds, and Mr. Shea Padivan.
12              Mr. Edmonds will be presenting oral
13  arguments.
14              THE COURT:  Okay.  Thank you.
15              MR. YARBROUGH:  Your Honor, John Zarian
16  and Trey Yarbrough on behalf of Newegg and Rosewill.
17              Mr. Zarian will be presenting our
18  argument.
19              THE COURT:  Okay.  Thank you.
20              MR. SUTTON:  Your Honor.  Ezra Sutton on
21  behalf of Sakar International.  I will be presenting
22  arguments on behalf of Sakar.
23              THE COURT:  All right.  Very well.  Thank
24  you.
25              Well, we are here on AdjustaCam's,
```

1   Newegg's, and Rosewill's motion for declaration of

2   exceptional case and award of fees and non-taxable

3   expenses, Docket No. 727.  And the other motion on

4   behalf of Sakar's -- similar motion, Docket No. 746.

5                   So you may proceed with presenting the

6   motion with -- whichever one of you would like to go

7   first.

8                   MR. ZARIAN:  Thank you, Your Honor.

9                   Your Honor, as the Court knows, this is a

10  motion brought pursuant to Section 285 which allows fees

11  to be awarded under circumstances which include

12  vexatious or unjustified litigation or like infractions.

13                  As evidenced by the papers, Your Honor,

14  and the record on file with the Court, this is such a

15  case.  And it is such a case based on a combination of

16  factors, including, Your Honor, a pattern of nuisance

17  value settlements obtained and extracted over the course

18  of this litigation all while claims stood rejected and

19  then were finally cancelled once these settlements had

20  been extracted pursuant to patent reexamination

21  proceedings before the USPTO.

22                  There is also, Your Honor, a relentless

23  effort throughout this course of the litigation by the

24  plaintiff to press what was clearly now and certainly

25  was clearly after claim construction, an entirely

 1  baseless and unmeritorious infringement position.

 2              THE COURT:  Is it your position that this

 3  case became vexatious, as you said, after claim

 4  construction; or that it was already so from the moment

 5  that it was filed?

 6              MR. ZARIAN:  We believe it clearly was

 7  after claim construction; but it was also, for the same

 8  reasons, before.  We think those were the positions that

 9  had been implicit and their invalidity arguments made

10  before the PTO which called into question the very

11  validity of the patent; but certainly as to infringement

12  after claim construction, Your Honor, we submit the

13  position adopted by the plaintiff in this case was

14  clearly baseless.

15              THE COURT:  Okay.  Do you believe that

16  infringement was clearly baseless prior to claim

17  construction?

18              MR. ZARIAN:  Not as a matter of law, Your

19  Honor.  The claim construction was still pending.  We

20  believe that the claim construction could and should

21  have been anticipated in part on its material points.

22  But, Your Honor, I think the focus of our argument is

23  clearly after claim construction this case was indeed

24  baseless on infringement.

25              THE COURT:  And are you seeking

1  attorneys' fees only after claim construction or

2  attorneys' fees prior to claim construction?

3            MR. ZARIAN:  Both, Your Honor.  And a

4  majority of the fees were incurred post-Markman.  I

5  think more than half.

6            THE COURT:  Were incurred when?

7            MR. ZARIAN:  After the Markman ruling.

8  Much of the work was done at the end, including expert

9  discovery and the like.

10           However, Your Honor, even prior to that

11 we believe that the pattern of nuisance value

12 settlements that were being extracted, existed.  And for

13 that reason we would seek -- including that reason, we

14 would seek attorneys' fees for the prior period of time

15 as well.

16           The record shows, Your Honor, that the

17 demands made of Newegg in particular -- and we cite

18 these only for the purposes of this motion and seek to

19 disclose no more about mediation or settlement

20 discussions than is warranted -- demands were made in

21 the amount of 75,000 and then 65,000 and 51,000 dollars.

22 And ultimately this case was voluntarily dismissed for

23 zero dollars.

24           Plaintiff's own damages expert opined

25 that the royalty rate implicit in the $75,000 demand was

1  clearly unreasonable.  And it was.  The damages here

2  chalked up by plaintiff's expert as to Newegg were

3  $17,000 at the end of the day.

4               And, Your Honor, the pattern by which

5  these settlements were obtained I think is instructive

6  and the amount of the settlements too.  This is, in

7  effect, very much like the Eon case.  And defendants

8  were concerned from the very outset of this litigation

9  that what we are facing with the large number of

10  defendants sued and the nominal demands being made, that

11  what we had here, in fact, was another pattern of

12  extracting nuisance value settlements on weak and

13  virtually baseless claims.  And that is what transpired.

14               Hewlett-Packard was one of the last of

15  the defendants to settle.  They had almost $29 million

16  in revenue --

17               THE COURT:  Who is this?

18               MR. ZARIAN:  Hewlett-Packard, HP, Your

19  Honor.  Almost $29 million in revenue according to

20  plaintiff's own expert and settled for $25,000.

21  Ostensibly, Newegg was dismissed to clear the field for

22  Sakar, which is also in court today; and to allow focus

23  on a more significant -- I think as the papers put it --

24  defendant.

25               Well, within days or weeks of the Newegg

1   dismissal, this plaintiff was also seeking to dismiss

2   Sakar and ultimately dismissed Sakar for zero dollars.

3                      Gear Head settled for $66,000.

4                      In fact, 20 or more defendants settled

5   for less than $100,000.

6                      And contrary to the argument that has

7   been made in the papers, there is no evidence of a

8   pattern -- an established royalty or pattern of seeking

9   some target royalty.

10                     In fact, for the 15 defendants who

11  settled, as to which our expert was able to derive an

12  imputed royalty based on sales, those royalties, Your

13  Honor, were are all over map, ranging from several

14  dollars to just a few cents.  And not one is within the

15  target range, allegedly, that was the focus of these

16  settlements.

17                     What we have, in fact, Your Honor was a

18  pattern of extracting litigation nuisance value and no

19  more.  There was no pattern of settlements or royalty

20  agreements having been reached, absent litigation.  In

21  each case a suit was filed and nuisance value was

22  extracted based on the pendency of a lawsuit.  That is

23  exactly what happened with respect to Newegg, Your

24  Honor.

25                     Your Honor, the infringement position as

1   it developed is also instructive and, again, clearly

2   baseless, as we have argued in our papers.

3                   The ball-and-socket joint that is

4   featured in substantially all of Newegg's and Rosewill's

5   cameras, these are products that do not include a camera

6   limited to a single axis of rotation.

7                   Now, the fiction to which plaintiff

8   adhered for some time in this case is that somehow that

9   single ball-and-socket joint was really two joints

10  somehow working together along a single axis of rotation

11  and another single axis of rotation allowing multiple

12  axes of rotation.  That position could never hold water,

13  and yet it was the position that was adhered to

14  throughout this case.

15                  It was only at the very deposition of the

16  technical expert for plaintiff in this case, that a new

17  theory was charted out, never seriously advanced, but at

18  that point Dr. Muskivitch tried to move to a hinge

19  member -- move the hinge member from the ball and stem

20  to the top half of the clip to somehow separate out the

21  second half of the clip and call that the support frame

22  to identify two new axes of rotation.  It was a dramatic

23  change.  This disclosed on August 24th, Your Honor,

24  2012.

25                  Now, that was after the original report

1   had been produced by Dr. Muskivitch, after a rebuttal

2   report had been produced by Newegg's expert, after that

3   expert had been deposed on that rebuttal report, and

4   after all of the preparation for the deposition of Dr.

5   Muskivitch.  And it was only at that very deposition on

6   that proceeding that a new report came out of his

7   attorney's -- plaintiff's counsel's briefcase and was

8   produced with a dramatically different position.

9                   We submit, Your Honor, in effect,

10  conceding that the original position that was advanced

11  and relentlessly pursued throughout the litigation was

12  baseless.  It never had merit, and clearly didn't have

13  merit after the claim construction ruling in this case.

14                  Your Honor, the pattern in this case of

15  extracting nuisance value settlements, again, in the

16  teeth of proceedings before the PTO in reexamination

17  that resulted inextricably in cancellation while

18  advancing a baseless infringement position, we submit is

19  exactly the very type of case for which Section 285 was

20  devised.

21                  This is a case which featured unjustified

22  litigation that from the very beginning appeared to all

23  accounts and certainly in hindsight, clearly, clearly

24  and convincingly shows a vexatious and unjustified

25  litigation; and it shows a pattern of infractions, Your

1    Honor, for which 285 affords a remedy.  And we ask the

2    Court to grant that remedy to Newegg and Rosewill in

3    this case.

4              THE COURT:  You mentioned these nuisance

5    value settlements.  Have you discovered all of the

6    settlements in this case?

7              MR. ZARIAN:  We have, Your Honor.  They

8    are summarized in our moving papers.  There were only

9    two that were in excess of $100,000.  And all of the

10   rest -- it is either 20 or 22 I believe, including the

11   last with Gear Head and HP were a hundred thousand

12   dollars or significantly less.

13             Now, it is interesting that a handful of

14   these show -- or purport to show a running royalty of

15   something more beyond certain thresholds.

16             As our expert has indicated, and this is

17   in the record, there is absolutely no evidence, in fact

18   it would appear that those thresholds were never

19   triggered, and that any higher running royalty of a

20   dollar or 1.25 or 1.50 was never paid by anybody.

21             That, I don't think is undisputed in the

22   sense of no evidence being in the record reflecting any

23   such payments being made.  We would submit that the

24   inference is there that this may well have been what we

25   might characterize as window-dressing on a settlement

1  that featured a lump sum that covered clearly all of the

2  expected sales or known sales; and that these thresholds

3  were set at a point where that running royalty would

4  never be had; in fact, was never had.

5           Your Honor, I think Sakar's Counsel has a

6  couple of other points to raise.  Unless the Court has

7  any further questions, I would rest at this point and

8  reserve for any reply.

9           THE COURT:  Okay.  Thank you.

10          Counsel.

11          MR. SUTTON:  Your Honor, I am here

12  representing Sakar International who sold some of these

13  units to a few of their customers such as Kohl's and

14  Fry's.  They are retailers, Kohl's and Fry's.

15          And I was criticized in my papers for

16  asking for legal -- attorneys' fees for defending Kohl's

17  and Fry's.

18          THE COURT:  Now, tell me who you

19  represent.

20          MR. SUTTON:  I represent Sakar

21  International who imported these units -- which I am

22  going to talk about -- and they were sold to a number of

23  retailers, and we had to indemnify some of those

24  retailers, such Kohl's department stores and Fry's

25  Electronics.

```
 1                    And in the course of the two- or
 2    three-year litigation we incurred legal fees in
 3    defending the other -- in addition to defending Sakar,
 4    which is my primary client, Sakar was asked to defend
 5    and indemnify the other defendants which I just
 6    mentioned, Kohl's department stores and Fry's
 7    Electronics.
 8                    THE COURT:  Did Kohl's and Fry's, did
 9    they settle?
10                    MR. SUTTON:  We all settled together, I
11    would say.
12                    THE COURT:  All right.
13                    MR. SUTTON:  What happened -- just to
14    finish that point, Your Honor, we had to do
15    interrogatories, document requests, depositions, you
16    know, general discovery, and motions for Kohl's and
17    Fry's.
18                    So if the Court decides that the
19    defendants are entitled to attorneys' fees in this case,
20    I wanted to answer the criticism I received in the
21    papers that why are we asking -- you know, we have no
22    right to ask for the legal fees for -- that we spent on
23    Kohl's and Fry's; and I just wanted to explain to the
24    Court at the outset that we were representing all three
25    of those defendants, Sakar who sold it to Kohl's and
```

1  Fry's.  And if --

2              THE COURT:  Are you making this motion on

3  behalf of Sakar or Sakar, Kohl's, and Fry's?

4              MR. SUTTON:  The motion is on behalf of

5  Sakar International because I sent my invoices -- when I

6  was doing work for Kohl's and Fry's, I would send my

7  invoice to Sakar, my client.  Sakar was the importer and

8  wholesaler of these items and sold them to Kohl's and

9  Fry's.  So Kohl's as the customer and Fry's as the

10  customer, under the UCC asked for indemnification by

11  Sakar.

12             So my invoices went -- my invoice for all

13  three defendants went to Sakar.  Sakar paid those

14  invoices to me and, therefore, I think we are in our

15  right to ask for -- if there is going to be a

16  reimbursement of any legal fees, I think we are in our

17  right to include the legal expenses that we incurred in

18  representing Kohl's and Fry's because Sakar paid for

19  those legal expenses.

20             THE COURT:  Now, what is Sakar's status

21  as a party?  Have you settled or have you been

22  dismissed?

23             MR. SUTTON:  Well, Your Honor, we were --

24  we had to negotiate an ending to the case.  What

25  happened is the plaintiff gave up their fight in the

1   Patent Office in September of 2012.  With regard to the

2   reexamining of claims, they were rejected three times,

3   and they finally gave up in September 2012.  And shortly

4   thereafter they dropped and abandoned their claims in

5   the Patent Office during the reexamination proceeding.

6             So at that moment in time there was no

7   longer any infringement claim because the patent was --

8   the claims were essentially gone.  So at that point in

9   time we spent a few months negotiating a settlement

10  and -- which included, you know, what Sakar could do in

11  the future with regard to what they can and cannot sell.

12            We resolved that issue; and then

13  eventually there was a motion to dismiss, which Your

14  Honor granted.

15            THE COURT:  A motion to dismiss by

16  agreement, right?

17            MR. SUTTON:  Correct.

18            THE COURT:  But did you pay any

19  compensation?

20            MR. SUTTON:  No, no.  No, we did not pay

21  any compensation because what happened was, Your Honor,

22  there were originally about 25 defendants in this case.

23  And as was pointed out to Your Honor a few minutes ago,

24  about 22 out of the 25 settled during the course of the

25  litigation.  And two defendants did not settle and pay

1   money, which is Sakar and --

2                   THE COURT:  Newegg.

3                   MR. SUTTON:  Newegg.

4                   THE COURT:  And what happened to Kohl's

5   and Fry's?

6                   MR. SUTTON:  They got -- to the best of

7   my recollection, they were also dismissed.  So Sakar and

8   its customers were dismissed from the case.

9                   THE COURT:  As part of the settlement

10  with Sakar?

11                  MR. SUTTON:  As part of the dismissal.  I

12  think it was basically a stipulation of dismissal with

13  certain terms in there about what could be done in the

14  future.  And so everybody was dismissed.  And the only

15  thing we did was we reserved our right for legal fees.

16                  THE COURT:  Did you represent Kohl's and

17  Fry's in the litigation?

18                  MR. SUTTON:  Yes, Your Honor.  That is

19  what I was saying.

20                  THE COURT:  Are Kohl's and Fry's moving

21  for attorneys' fees on their own behalf?

22                  MR. SUTTON:  No, because they didn't pay

23  the legal fees.

24                  THE COURT:  Well -- okay.

25                  MR. SUTTON:  In other words, we

1  indemnified them and we represented them.  Sakar --

2  these were their customers, so Sakar paid the legal fees

3  to represent them.  So Sakar incurred legal fees for

4  Kohl's and for Fry's, incurred those legal fees, you

5  know, through my office.

6                    THE COURT:  But in order for you to

7  recover attorneys' fees as to Kohl's and Fry's, don't

8  you have to establish that this was an exceptional case

9  as to Kohl's and Fry's, not just to Sakar?

10                    MR. SUTTON:  Well, Your Honor, the facts

11  that I am going to go through now which relate

12  primarily -- I'm going to discuss the product in

13  question, the facts that I am going to tell the Court

14  about, are basically the same facts as they relate to

15  Kohl's and Fry's because they were selling the same unit

16  and the same issues of infringement, validity, nuisance

17  value settlements; and the four issues that I am going

18  to discuss applied to all of these group of defendants

19  because they were selling basically, Your Honor, the

20  same product.

21                    THE COURT:  Okay.  Go ahead.

22                    MR. SUTTON:  Okay.  So we believe that

23  this case is an exceptional case, Your Honor, for any

24  one of the following four reasons or for any combination

25  of them:

```
 1              The first reason is that the asserted

 2   claims were rejected by the U.S. Patent Office in

 3   Washington as being invalid.  And they were rejected

 4   three times based on the Irifune reference, which was

 5   used in the reexamination in the Patent Office.

 6              And the asserted claims are rejected

 7   three times, and -- then they dropped the patent claims.

 8   By that time AdjustaCam had extracted over 20

 9   settlements -- about 22 I think it is -- and the

10   Examiners in the Patent Office are, we submit, objective

11   and eventually AdjustaCam --

12              THE COURT:  Okay.  I mean, you are

13   basically making the same argument that Newegg's

14   attorneys made.  Do you have any new arguments that

15   relate specifically to your client?  I understand the

16   basic facts of what is going on.

17              MR. SUTTON:  Yes, Your Honor.  I just

18   want to go into a little more detail because our product

19   is somewhat different --

20              THE COURT:  Well, tell me about your

21   product.  I would be very interested in hearing about

22   it.

23              MR. SUTTON:  All right.  Okay.

24              THE COURT:  If you have an exemplar copy,

25   that you could pass up to me that would be helpful to
```

1   me, I would like to look at it.

2               MR. SUTTON:  Before I get into that, just

3   let me take a moment and say I am not going to repeat

4   the arguments that my -- that the other Counsel made

5   with regard to nuisance value settlements.  I am sure

6   the Court understands that.

7               Then I am also not going to repeat the

8   arguments relating to -- well, actually we do have one

9   other argument on the Rule 11 that I do have to address.

10  Let me just quickly address that.

11              As to Rule 11, in the 30(b)(6) deposition

12  of AdjustaCam, their representative was Mr. Haynes; and

13  he admitted that he did not take a number of pre-filing

14  litigation steps as set forth in Appendix C of our

15  papers -- there is a whole list of things they did not

16  do.

17              And Mr. Edmonds tried to cure this with

18  his own affidavits.  And as stated by the case of Rainey

19  v. American Forest, 26 F.Supp.2d 82 District Court of

20  DC, a 1998 case, they said in that case:  The eleventh

21  hour alteration by an affidavit is inconsistent with

22  Rule 30(b)(6) and is precluded by it.

23              What happened in our case is that Mr.

24  Edmonds has submitted an affidavit stating things that

25  he did prior to the litigation and -- but Mr. Haynes

1  when we took his 30(b)(6) deposition said all of those

2  things were not done, and we have listed them very much

3  in detail in an appendix attached to our brief.

4             Your Honor, you can also look at the case

5  of Eckert, E-c-k-e-r-t, v. Kemper, K-e-m-p-e-r, cited in

6  our brief which, in quotes, says:  It precludes

7  wholesale changes to previous sworn testimony.

8             Thus, we submit that Mr. Edmond's

9  declaration should be precluded as part of his

10  submission in this case.

11             So that all goes to that Rule 11

12  discussions where Mr. Haynes clearly testified that he

13  didn't do anything and was not shown anything as part of

14  his pre-filing investigation under Rule 11.

15             All right.  Let me go into our product

16  now, Your Honor.

17             First, I want to address invalidity

18  because I think it is important because the invalidity

19  and infringement arguments are both the reason for this

20  motion.  And let me just quickly address invalidity.  It

21  will take a couple of minutes, Your Honor; just a few

22  points that I wanted do get out -- they are in our

23  brief, but I just want to highlight a few points.

24             As I said a moment ago, AdjustaCam's

25  claims were rejected by the U.S. Patent Office three

1  different times based on the same Irifune -- that's

2  I-r-i-f-u-n-e -- publication and were held to be invalid

3  on each rejection.  The first rejection, Your Honor, was

4  on August 12, 2011.  It was based on the Irifune patent,

5  and it was rejected under 35 USC 102, which, I am sure

6  as Your Honor knows is a full anticipation of all of the

7  claims by Irifune.

8           Then on -- then they submitted an

9  argument back to the Patent Office, and then there was

10  another -- a second office action on March 8th, 2012

11  based -- where the Examiner again cited the Irifune

12  patent, relied on it again under 35 USC 102 and said,

13  again, under 102 that if fully -- the Irifune patent

14  fully met all of the claims of the patents-in-suit.

15  Then they came in -- the plaintiff came in and submitted

16  another argument arguing against Irifune for a second

17  time.

18           Then the Patent Office came back and

19  issued what they call a final rejection, a third

20  rejection; and the Examiner in the Patent Office made it

21  final.  And that was on August 30, 2012.  And, again, it

22  was based on Irifune for the third time; and it was

23  based on 35 USC 102, which is a full anticipation.

24           Then the next thing that happened -- that

25  was in August.  The next thing that happened was in

1  September 2012, AdjustaCam finally decided to abandon

2  their claims that were pending in the US Patent Office.

3                And at that moment in time in

4  September -- by the time of September 2012, Your Honor,

5  I think there were just two of us left in the case.  All

6  of the other defendants had left.

7                And AdjustaCam's own expert, Dr.

8  Muskivitch, agreed on cross-examination that with regard

9  to the Irifune publication -- I cross-examined him, and

10  I asked him:  If you loosen the screw on the top of the

11  Irifune structure and then the camera is mounted on that

12  screw, on that screw and then you rotate the screw about

13  the first vertical axis extending through the screw and

14  also the camera rotates about the second horizontal axis

15  that is in Irifune.

16                And I asked him in Mr. Muskivitch's

17  deposition at Page 316, I asked him:  Does he agree that

18  that is the way that if you loosen the screw in Irifune

19  you would be able to rotate the camera about a vertical

20  axis and also rotate it about a horizontal axis, which

21  are the same two axes in the patent-in-suit?  He said:

22  Basically, yes.

23                That is in deposition at Page 316.

24                Again, those are the same two axes that

25  the Court finds in the patent-in-suit.  There is a

1  vertical axis through the camera that is shown in the

2  patent, and the vertical axis is numbered 26, if the

3  Court wants to look at it.  And then there is a separate

4  horizontal axis 32 also shown in the specification in

5  Figure 4 of the patent-in-suit.

6           And the claims are also -- Claims 1 and

7  19, Independent Claims 1 and 19 have Paragraphs (a) and

8  (b), and Paragraph (a) is directed to the vertical axis

9  and Paragraph (b) is directed to the vertical axis.

10           Now, accordingly, AdjustaCam's actions to

11  meet the test of -- I'm sorry.  AdjustaCam's actions

12  failed to meet the test of reasonable objectivity since

13  the claims were repeatedly rejected by the Patent

14  Office, three times by the Patent Office, and then

15  dropped near the end of the litigation.  And also since

16  its own expert Dr. Muskivitch agreed that the Irifune

17  patent showed the same basic structure as the

18  patent-in-suit.

19           In September 2012, as I said, the

20  plaintiff, AdjustaCam, dropped the rejected claims.  So

21  on this point, Your Honor, I just want to add with

22  regard to invalidity -- this is all about invalidity --

23  that AdjustaCam's strategy was to keep the '343 patent

24  alive long enough until it had extracted settlements

25  from over 22 defendants in the range of at least, I

1  believe it is over 2 million dollars.

2                    This conduct and strategy should not be

3  condoned by the Court.  So this is the first reason why,

4  we submit, that this was an exceptional case and we

5  are -- and that the defendants are entitled to

6  attorneys' fees.

7                    Now, with regard to the infringement

8  issues, Your Honor, AdjustaCam followed a similar

9  strategy that it did with invalidity.  Sakar's accused

10  camera does not meet the structure, does not meet the

11  structure -- and I am going to show this to Your

12  Honor -- does not meet the structure of Independent

13  Claims 1 and 19, including both Paragraphs (a) and (b)

14  of the claims.

15                    Now, may I get a little closer to the

16  Court -- I only have one sample here, and I just want to

17  briefly explain it.  Is it okay?

18                    THE COURT:  Yeah.  Well, why don't you

19  pull out the overhead projector there.

20                    Mr. Yarbrough, show him where that is.

21                    And you can hold it on that, and

22  everybody can see what you are demonstrating.

23                    MR. SUTTON:  Okay.

24                    (Pause in proceedings.)

25                    THE COURT:  I don't think you have it

1  working.

2              MR. YARBROUGH:  There you go.

3              MR. SUTTON:  Oh, over there.  Okay.  I

4  don't know if the Court -- it is on this screen over

5  here.  Is it anywhere --

6              COURT SECURITY OFFICER:  They have got it

7  everywhere.

8              MR. SUTTON:  Oh, they have got it

9  everywhere, okay.

10             THE COURT:  It doesn't look like that is

11 blown up quite right as far as the zoom.  I think you

12 can zoom in some to get the full screen.

13             (Pause in proceedings.)

14             THE COURT:  Okay.  That's good -- a

15 little too far.

16             MR. SUTTON:  Okay.  All right.  Your

17 Honor, this has two parts.  Let me just -- see if I can

18 get my hands out of the way.

19             THE COURT:  Back it up a little bit.

20 There.  And find a good average.  A little more.  A

21 little more.  Just a full screen.

22             MR. SUTTON:  I'll make it a little

23 bigger.

24             THE COURT:  That is good right there.

25             MR. SUTTON:  Right there.  Okay.

 1                    All right.  Your Honor, this part that I
 2  am holding is the camera, and at the bottom of it there
 3  was a shaft coming out of this bottom piece which we
 4  broke -- which I broke off in order to show how this
 5  works.
 6                    So the camera sits on top of this base or
 7  support frame, and there was a shaft coming out of the
 8  bottom that is fixably -- I don't know if you can see
 9  it -- that is fixably attached.  The shaft came out of
10  here.  Fixably attached to the bottom of the camera.
11                    And the shaft had a ball that went into
12  this hole here.  So when it was assembled it sat -- the
13  camera sat on top of the base.  Let me just get it at
14  the right angle here.  Set on top of the base.
15                    THE COURT:  Counsel, I can tell you that
16  you haven't had much experience with over --
17                    MR. SUTTON:  Not with a three-dimensional
18  object.
19                    THE COURT:  All right.  I think we have
20  got -- why don't you pass it up to me and let me look at
21  it and I will see it a little better.  I have trouble
22  with them, too, so don't feel too bad.
23                    MR. SUTTON:  Yeah, again, this is where
24  the shaft comes out of the bottom.  And then it has the
25  ball --

```
 1                  THE COURT:  Ball on the end of the shaft.
 2                  MR. SUTTON:  The ball and shaft and goes
 3  into the support frame.
 4                  THE COURT:  Okay.
 5                  MR. SUTTON:  Now, Sakar's structure does
 6  not meet the limitation in Paragraph (a) of Claims 1 and
 7  19.  And, again, Dr. Muskivitch agreed with this in his
 8  cross-examination.  The reason is that Paragraph (a) of
 9  Claims 1 and 19 require that the camera 12 be
10  rotatable -- and that is the key word, Your Honor, be
11  rotatable with respect to the first axis of rotation
12  relative to the hinge member 74.
13                  And Figure 4 of the '343 patent actually
14  shows the structure.  Your Honor, this is Paragraph 4 of
15  the patent-in-suit -- excuse me.  Figure 4 of the
16  patent-in-suit.  And here is the camera 12 --
17                  THE COURT:  Counsel, you need to speak
18  into the microphone.
19                  MR. SUTTON:  Oh, I'm sorry.
20                  Here is the camera 12 above it, and then
21  it has the support frame, which are these two legs below
22  the camera.  And then it is very difficult to see, but I
23  am going to point to two different hinges.
24                  There is a vertical axis where this arrow
25  is, going through -- it has number 26 and there is a
```

1  vertical axis going through that member which has a
2  number 80 that I have circled.  And if Your Honor can
3  see, the camera is pivoting on that part and it pivots
4  in a -- about a vertical axis.
5              So there is one pivot point in this
6  vertical axis, which is at Paragraph (a), which says a
7  first vertical axis.
8              And then there is a second axis, which is
9  this point 82 which is a horizontal axis.  And you can
10 see it actually better in Figure 3.  It is the axis
11 going this way, the horizontal axis.  So there is a
12 pivot point for the two legs which make up the support
13 frame.
14             So you have two different axes in this
15 patent.  Again, the vertical axis, which is 26 and the
16 horizontal axis which is 82.
17             And under claim construction, the Court
18 determined that the -- that each axis is a -- only has a
19 single -- only has a single axis.
20             In other words, there is not rotation in
21 the vertical.  There is only rotation about a single
22 axis.  Not multiple axes.  And then in 82 is only
23 rotation about this single axis, horizontal axis; not
24 multiple.  And those were the main determinations, I
25 believe, of the claim construction.

1                     So what I was trying to say -- now that

2     you have seen the patent-in-suit and how that works and

3     it has the two different axes, what we are saying, Your

4     Honor, is Paragraph (a) of Claims 1 and 19, you know,

5     that have the camera 12 being rotatable with respect to

6     a first axis of rotation relative to that hinge member

7     74, which I pointed to right here.  This hinge member

8     74.  And then it has a hole going through it about which

9     the camera rotates around a vertical axis.

10                    Now, Figure 4 of the '343 patent drawing,

11    clearly shows that the camera 12 is rotatably mounted on

12    the first vertical axis 26.  There is a rotational

13    mounting here.

14                    Is rotatably mounted on the first

15    vertical axis.  And there is no way, Your Honor, that

16    AdjustaCam can reasonably argue that Sakar's vertical

17    shaft coming out of the bottom of the camera that was --

18    I handed you, Your Honor, the camera part.  And there

19    was a shaft and a ball coming out of the bottom.

20                    And that shaft was fixedly attached to

21    the bottom of the camera.  So there was no rotational

22    movement between the camera that Your Honor was holding

23    and the shaft that was fixed to the bottom of it that

24    had a shaft and a ball there.

25                    So the claim requires rotation.  There

1   the pin was fixed to the bottom of the camera, so there

2   was no rotation in Sakar's device.  From day one there

3   was never any rotation in Sakar's product between the

4   camera and the shaft attached to the bottom, which is

5   what is required -- that is exactly what is required in

6   the claims of the patent-in-suit and in Figure 4 --

7   shown in Figure 4 of the patent-in-suit.

8               Very clearly, Your Honor, the structure

9   in the Sakar camera does not and cannot meet the

10   rotatable hinge 80 having a vertical axis 26 as shown in

11   Figure 4 of the '343 patent.  Thus, there is no

12   infringement of Paragraph (a) of Claims 1 and 19 by the

13   Sakar device.

14               Moreover, Your Honor, on

15   cross-examination of their own expert Dr. Muskivitch, I

16   had the following simple exchange with him at Pages 280,

17   308, and 311 of his deposition.  That is Dr.

18   Muskivitch's deposition.

19               And, basically, he said that the Kodak

20   camera, which is the Sakar camera, does not rotate

21   relative to the stem and ball.  The camera does not

22   rotate relative to the stem and ball which were fixed to

23   the bottom of the camera.  And the word "fixed" means

24   they can't rotate it.  So they can't rotate relative to

25   each other.

1               He agreed to that in three times -- he

2      agreed to that statement basically three times.  And it

3      is attached to our Appendix A in our brief.  And I will

4      read you the exact sentence from the deposition, Your

5      Honor, just so you will see what the expert said.

6               The question was:  So am I correct -- is

7      it correct to say that the Kodak camera does not rotate

8      relative to the stem and ball because they are fixed to

9      each other?

10               ANSWER:  That's correct.

11               And that statement was at Page 280 of his

12      deposition.  And basically similar questions were asked

13      on Pages 308 and 311 of Dr. Muskivitch's deposition.

14               So I am submitting to Your Honor that

15      even plaintiff's own expert when he was asked whether or

16      not the Kodak structure rotates in the same manner as

17      shown in the patent-in-suit and as shown in Figure 4, he

18      said, no rotation, there is no rotation.  There is no

19      rotation.  They are fixed.  So, therefore, there is

20      no -- let me just -- oh, okay.

21               Now, I just discussed Paragraph (a) of

22      both Claims 1 and 19, and I explained why there was no

23      infringement because there is no rotation of the Kodak

24      camera base and the shaft that was fixed to it.  I just

25      want to quickly address, Your Honor, Paragraph (b) of

1   Claims 1 and 19 of the patent-in-suit.

2                  They call for the support frame -- which,

3   Your Honor, I am pointing to the screen.  The support

4   frame are these two legs that are connected to the

5   bottom of the camera 12.  This is the camera.  These two

6   legs make up what is called a support frame 18.  Here is

7   the number 18.  When you read the patent, they talk

8   about that support frame.

9                  And they -- the claims call for the

10  support frame 18 being rotatably attached to the hinge

11  member.  Again, this is a different hinge member.  I'm

12  going to point to 82.  I'm sorry.  I'm going to point to

13  82 here.  And this hinge member 82 is different from the

14  vertical hinge member that we talked about a moment ago

15  in Paragraph (a) of the claim.  This is the vertical

16  hinge.  This is the horizontal hinge, which is also

17  shown in Figure 3 as a horizontal hinge in a horizontal

18  direction as compared to the vertical direction.

19                 So just to be clear, it is a little bit

20  confusing, let me just say it one more time; that in

21  Paragraph (a) of Claims 1 and 19 they talk about this

22  rotational axis, which has the number 26.  And in

23  Paragraph (b) of both claims they talk about this

24  horizontal axis 82 which has a pivot point where I am

25  pointing to now, and it is also shown more clearly in

1  Figure 3.

2            Now, with regard to Paragraph (b) of both

3  of those claims, Your Honor, again, they call for the

4  support frame, which are the legs, being rotatably

5  attached to that hinge and rotating about the second

6  axis of rotation, which is the horizontal axis 82 shown

7  in Figures 3 and 4.  With the -- with the rotation being

8  relative to the support frame 18.

9            So this axis 82 allows the support frame

10  and legs to rotate relative to this hinge member, which

11  is, again, a separate hinge member from the vertical.

12  And by claim construction that was determined to be a

13  single -- it can only be a single axis of rotation.

14            However, Kodak's structure actually has

15  two axes of rotation, one in the vertical position and

16  another one in the forward tilt position.  And, Your

17  Honor, so there are two axes of rotation in our device.

18            And I know it is an imposition, but would

19  Your Honor mind if I just show you -- come up and show

20  you what I am talking about?

21            THE COURT:  All right.  This is hard to

22  see on this because you have broken the pivot off?

23            MR. SUTTON:  Yes.

24            THE COURT:  I can't even see how it

25  attaches to the ball and joint, but you can show me if

1  you want to.

2              MR. SUTTON:  I will try and do it, but I

3  recognize that it makes it more difficult.

4              THE COURT:  You don't have one that's not

5  broken?

6              MR. SUTTON:  To be honest with you, I put

7  it in my suitcase on this trip, and it broke in the

8  suitcase.  So I was working with it last night, and I

9  just didn't wrap it up properly.  I apologize.

10             MR. SUTTON:  What I want to show Your

11 Honor is pretty simple.  There is a pin coming out of

12 the bottom of this and a ball that sits in this hole.

13             THE COURT:  Right.

14             MR. SUTTON:  So when it is sitting on

15 that hole and when I was able to play with it last

16 night --

17             THE COURT:  It can rotate along the

18 vertical axis or along the horizontal axis, right?

19             MR. SUTTON:  Well, actually what I want

20 to explain here, with regard to Paragraph (b) of the

21 claim you get two -- you get two axes of rotation

22 instead of a single one.  And how do you get the two?

23 One is this way.  And then you can actually bend it

24 forward.  It was called in the deposition the tilt

25 forward position.

```
 1              Then in the tilt forward position you can
 2   rotate it about that axis.  So you rotate it about a
 3   vertical axis and then you tilt it forward and still
 4   rotate it about a tilted axis.  So it doesn't infringe
 5   the Claim B of Claims 1 and 19 because on the claim
 6   construction that Claim B, Paragraph (b), of the claims
 7   were held to be limited to a single axis of rotation,
 8   which was called the second axis of rotation, which is
 9   in Figures 3 and 4 is the pivot point 82.
10              But when you look at the Kodak product,
11   it had -- it had -- when it was attached with the ball
12   and socket, it could rotate about a vertical axis, and
13   it could rotate -- when you move it forward it could
14   rotate also.  So it had at least two axes of rotation.
15              And Dr. Muskivitch agreed to that as well
16   when we went over it in the deposition, and I am going
17   to refer to the page numbers.  Just let me give you
18   that, Your Honor.
19              If you look at Dr. Muskivitch's
20   deposition at Pages 304 and 313, I asked him the
21   following question, and I will just quickly read the
22   question and answer that he gave on Page 313:
23              QUESTION:  If there is a vertical axis of
24   rotation and then it is a different axis of rotation in
25   the forward tilt position, that is two axes of rotation,
```

1  correct?

2              ANSWER:  Yes.

3              So, Your Honor, that is attached to our
4  brief as an appendix, and it is a quote from the
5  deposition of Dr. Muskivitch, which is part of the
6  papers that have been submitted to Your Honor.

7              So even the expert of plaintiff agreed
8  when we questioned him on cross-examination that there
9  were two axes of limitation with regard to the
10  limitations of Paragraph (b).  And under claim
11  construction, there could only be one axis of rotation.

12              And I submit to Your Honor that this
13  whole exercise that I have been talking for the last
14  five or ten minutes shows that from day one -- well,
15  actually, let me amend that.  Not from day one.  But our
16  product always worked that way from Claim 1, but the
17  claim construction made it even clearer that the patent
18  could only have a single axis of rotation in the
19  vertical as shown here.  There could only be a single
20  axis of rotation.  And here there could only be -- and
21  that is a single axis of a vertical rotation and here 82
22  there is only a single axis of rotation.

23              And, again, Sakar never had a rotatable
24  member connected to the bottom of the camera the way the
25  patent does.  And it never had -- it always had more

1  than one axis of rotation; whereas, the patent always

2  had a single axis of rotation.  So for those reasons, we

3  submit that there was never any infringement.

4                    And, Your Honor, as an aside -- and I

5  don't know if I should say this or if it is proper to

6  say this in open court, but I used to be a Patent

7  Examiner; and when I read the three arguments made by

8  the Examiner in Washington and I read the three replies

9  made by the plaintiff to the three rejections, I told

10  Sakar early on that there is no way the Examiner in

11  Washington was going to allow the claims to this patent

12  in the reexamination because of the very points I am

13  talking about; that -- that the Irifune patent, which

14  was prior art was held -- was held to be -- was held to

15  render the claims invalid.

16                    And then I also told Sakar that there

17  could never be any infringement because that patent and

18  that structure that I have been repeating and repeating,

19  Your Honor, is single axis of rotation at axis 26, and

20  we don't have that.  Sakar's product doesn't have that.

21                    And then another axis of rotation, a

22  separate axis of rotation 82, which is the horizontal

23  axis of rotation, which is shown here, we didn't have

24  that.

25                    And, Your Honor, I settle cases.  I don't

1   litigate that much.  I try to settle all my cases.  But

2   they asked us for $800,000 and I could not -- then they

3   dropped down to 200,000, and I said I am not paying

4   anything.  You know, I said you are going to be rejected

5   by the Patent Office and your claims are invalid.

6              So Sakar listened to me.  Sakar, Fry's,

7   and Kohl's never paid any money, never listened to their

8   demands.  Thank God they listened to me, and thank God I

9   was right that the Patent Office did what I thought they

10  were going to do, which is reject all those claims.

11             And then Mr. Edmonds actually dropped the

12  claims.  I thought if his position was correct, he would

13  have appealed them; but he didn't bother appealing them.

14  I think, Your Honor, that is very telling when an

15  attorney is prosecuting claims through the Patent Office

16  and, you know, after everybody -- there is only two

17  parties left in the case, he now drops those claims and

18  doesn't appeal them.  I think that is very telling.  He

19  knew he didn't have a good case.

20             Your Honor, thank you very much.

21             THE COURT:  Thank you.

22             Response.

23             MR. EDMONDS:  Thank you, Your Honor.

24             We have some materials on the PowerPoint

25  for the Court here.  I also added a couple of slides on

1   the fly based upon some things that were said that I

2   think are enlightening as to kind of what is going on

3   here.

4                    (Picture shown on PowerPoint.)

5                    THE COURT:  Who is the girl, is she your

6   girlfriend?

7                    MR. EDMONDS:  I'm sorry, Your Honor.

8                    THE COURT:  Is she your girlfriend?  Very

9   nice.

10                   MR. EDMONDS:  Yes.  I missed that, Your

11  Honor.  Sorry.

12                   In the first instance, to put this into

13  context, there is a timetable as to what happened with

14  this case.  Obviously the end result was not what the

15  plaintiff had wanted, but that doesn't make this case

16  exceptional.  Litigation doesn't always happen the way

17  we want it to.

18                   In the first instance, the timeline

19  starts well before AdjustaCam even took assignment to

20  the patent.

21                   Back in 2001, late 2001 the original

22  patentee, PAR Technologies licensed the patent to

23  Philips for royalties that were averaged a dollar fifty

24  webcam.  Philips, by the way, was -- as it says in the

25  expert report that was on record, was one of the

1  industry leaders.

2           Shortly after that, PAR Technologies

3  licensed to Logitech for 1.25 per webcam.  As -- also in

4  the record and in our expert report, Logitech was the

5  industry leader at the time.  In fact, it is of record

6  that Logitech is paid over at the time 2.2 million

7  dollars.  Now that is well over two-and-a-half pursuant

8  to its license.  And, in fact, it still continues to

9  pay.

10          AdjustaCam took assignment of the patent

11 in 2010.  The lawsuit was filed.

12          During the course of the lawsuit,

13 AdjustaCam entered into six patent license and

14 settlement agreements that are addressed in our expert

15 report and also in the deposition of our expert, who

16 testified about this under oath.  There is also

17 testimony under oath from AdjustaCam's Rule 30(b)(6)

18 designee Mr. Haynes; that the benchmark that AdjustaCam

19 were using for its settlement metric for the defendants

20 was 1.25 to 1.50 per webcam in accordance with the

21 precedence that had been set by the Philips and Logitech

22 licenses.

23          THE COURT:  Let me ask you in regard to

24 Philips how much royalty did they recover?

25          MR. SPANGLER:  I think ultimately it is

1  somewhere north of 250,000.  Philips, subsequent to

2  that, is no longer much of a player in this segment of

3  the webcam industry.  It may be because of the fact that

4  Logitech knocked them out.

5              So the settlements -- and essentially

6  what these defendants were buying was a right to sell a

7  certain number of webcams for a certain amount.  And it

8  is set forth in the terms of these settlement

9  agreements.  I have an example for you.

10             Here.

11             Where this particular one, this is

12 Trippe, paid $25,000 for an amount not to exceed 16,500

13 webcams.  There is a separate provision after that.

14 Then they pay $1.50 per royalty.

15             So this notion that AdjustaCam's

16 settlement practices or licensing metrics are arbitrary

17 or somehow improper, is just completely incorrect.  And

18 the mistake that the defendants make is that they see a

19 settlement of a fairly modest amount, and the reality

20 behind that settlement is that the sales volumes were

21 just fairly modest.

22             And those defendants paid exactly how the

23 process should work.  They paid a reasonable royalty

24 based upon their level of infringement, really the

25 opposite of what has been characterized as a shakedown.

```
 1                Further -- so now we have in November
 2  4th, 2010 the reexamination proceedings were commenced.
 3  And I think the commencement date is significant in the
 4  fact that the reexamination lasted almost two years.
 5                And something that Counsel For Sakar says
 6  is so cut and dry, as the Court is probably aware from
 7  its experience with reexamination proceedings, it is
 8  never so cut and dry.
 9                As a matter of fact, the record shows
10  that the USPTO actually had five different references
11  that it asserted as invalidating.
12                I am going to talk slower, Your Honor.  I
13  apologize.
14                The USPTO had five different references
15  it asserted were invalidating.  They were Ma, Dovey,
16  Irifune -- has been talked about here -- and Yamauchi.
17  And ultimately all of those references except for
18  Irifune were overcome.
19                And I think that a patentee has the right
20  to contest proceedings in the USPTO, and AdjustaCam
21  certainly succeeded in persuading the USPTO that it
22  erred in many respects in its claim rejections and
23  ultimately fell short with respect to Irifune.  But,
24  again, that does not make it an exceptional case.
25                THE COURT:  Was the Irifune reference
```

1  considered by the Patent Office when the initial patent

2  was issued?

3                    MR. SPANGLER:  It was not.  The -- it is

4  also addressed by our expert, which I will get to in a

5  minute.  It certainly was addressed in this lawsuit.

6                    Following that, as the case proceeds and

7  as this -- as the back-and-forth with the Patent Office

8  proceeds for almost two years, AdjustaCam entered into

9  14 more settlement agreements with various defendants.

10                   And the sworn testimony is that the

11 benchmark used for those was, again, the 1.25, 1.50 per

12 webcam for sales.

13                   On April 10th, 2012 the Court issued its

14 Markman order.  And as what has been pointed out, the

15 Court said that the rotatably attached means that

16 something rotates in a single axis of direction.

17                   Further to that and it is sworn evidence

18 of record -- it is not disputed -- AdjustaCam dropped 16

19 webcams from the case.  And they were dropped from the

20 case and evidence of record in consultation with its

21 technical expert, an engineer with a PhD; and it

22 reasonably and appropriately narrowed its case in

23 response to the Markman ruling.

24                   But the parties still differ as to -- not

25 surprisingly the parties still differed as to

1   infringement even after AdjustaCam had pared down its

2   case.

3                   Marching forward to July of 2012.  The

4   case is pressed to a fairly advanced state for who is

5   left.  AdjustaCam has already issued its infringement

6   report.  The defendants -- AdjustaCam has already issued

7   its damages report.  Its damages report opines that a

8   reasonable royalty is $1.25 to $1.50 per webcam.

9                   There is a suggestion by the defendants

10  that AdjustCam somehow, quote, fabricated this $1.25 to

11  $1.50 royalty for the purposes of this exceptional case

12  motion.

13                  The facts are that AdjustaCam has a very

14  experienced, a very reputable damage expert who gave a

15  very detailed report that is on record with the Court.

16                  And it is -- that was the damage expert's

17  opinion in the case, and that was well before anyone

18  made any hint or suggestion that this was an exceptional

19  case or that anybody had done anything frivolous.

20                  So this is entirely consistent with

21  AdjustaCam's position throughout the entire case, and it

22  is backed up by the reasoned analysis of its expert.

23                  As the case goes on, Gear Head and HP

24  settle.  And there has been a --

25                  THE COURT:  What is your response to

1   their argument about HP's settlement was way out of

2   relation to their revenue?

3                   MR. EDMONDS:  I have a slide -- well, you

4   know -- in fact, this is one of the slides I added on

5   the fly, Your Honor, because I had not heard that

6   before.

7                   I think this is illustrative of the kind

8   of slap-shot approach that has been given to this motion

9   and really how the facts have really been misconstrued

10  by the Court (sic).

11                  If you can go to the prior one.  Go back.

12  Okay.  That is fine.  No.  No.  That is good.

13                  I hope you can see this, so AdjustaCam's

14  expert Mr. Bratic initially issue a report and it had --

15  what happened with Newegg was -- excuse me, with HP was,

16  additionally, HP had a significant amount of sales.

17                  AdjustaCam along the way licensed some

18  foreign suppliers.  And the licenses were made based

19  upon the information provided by those suppliers as to

20  what they thought that their U.S. sales were.

21                  And unfortunately for AdjustaCam and

22  really what -- a kink in this case is that after those

23  settlements were made, HP came back and said, oh, by the

24  way, almost every webcam we have sold is covered by a

25  license from a foreign supplier.

1                     And so AdjustaCam's damage expert Mr.

2     Bratic had to go in and issue a supplemental report in

3     which he trimmed down his damage number for HP to

4     $11,000.  And HP, as they represented, settled for

5     $20,000.  And the basis of the settlement was that there

6     were $11,000 in past damages.

7                     So this page here is from the

8     supplemental report of Mr. Bratic in which he says

9     because of the Chicony license and the Creative

10    license -- Creative was supplied by another foreign

11    supplier -- I had to go in and readjust my numbers for

12    HP.

13                    So HP's numbers were dropped to $11,000

14    and HP -- and AdjustCam looked at that and said, well,

15    you have $11,000 in past damages.  You are going to be

16    selling a limited number of webcams for the duration of

17    the patent.  It goes through 2017, so they came at a

18    number of $20,000.

19                    But the representation of the Court that

20    there were 29 million dollars in HP sales is just flat

21    wrong.  In fact, our expert opined $11,000 of sales with

22    HP.  I think it just illustrates how the movants really

23    seem oblivious of the facts here and have really

24    stretched things for the Court.

25                    If you go back to the timeline.  Thank

1  you.

2           So after HP and Gear Head settle, most of

3  the retailers were now non-issues in the case, most of

4  the remaining retailers; those being BestBuy, Fry's,

5  Micro Center, Office Depot, and Wal-Mart.  In other

6  words, their sales were downstream of these

7  manufacturers.

8           The only manufacturer left in the case at

9  that point was Sakar and Newegg, which has a -- almost

10  negligible amount of house-branded webcams.

11           And so AdjustaCam quite reasonably said

12  now that all of the manufacturers have settled out

13  except for Sakar essentially, who had nothing to do with

14  any of these retailers, now they have settled out.  Our

15  dispute with you retailers is over.  The manufacturers

16  have taken care of it for you.  They have settled this

17  dispute for you.

18           So all of those defendants, including

19  Fry's, who Mr. Sutton somehow claims attorneys' fees for

20  who has a dismissal with prejudice with both sides to

21  bear their fees and expenses, again, just a snapshot

22  approach towards this entire proceeding.

23           All of these retailers voluntarily exited

24  the case because their manufacturers had taken care of

25  the issue for them.

 1                    THE COURT:  Now, Fry's was a retailer,

 2   wasn't it?

 3                    MR. EDMONDS:  Correct.  In other words,

 4   once HP and Gear Head had settled -- HP and Gear Head

 5   were the last of the manufacturers that were left.  So

 6   once they had settled these other retailers were out of

 7   the case.  As the case had proceeded and as you can

 8   imagine how a case proceeds against a retailer --

 9                    THE COURT:  Did Sakar supply products to

10   Kohl's and the other one?

11                    MR. EDMONDS:  Only Kohl's, to my

12   knowledge, only Kohl's.  In the damage report that is of

13   record, Kohl's was the only downstream retailer of

14   Sakar's HP webcams.

15                    THE COURT:  But was the quantity that

16   they had supplied small or large or --

17                    MR. EDMONDS:  I had the Bratic report

18   handy.  I mean, the damage number against Sakar --

19                    THE COURT:  Excuse me just a minute.

20                    MR. EDMONDS:  -- was about 200,000 -- oh,

21   I'm sorry, Your Honor.

22                    THE COURT:  What I am trying to figure

23   out in my mind, Mr. Edmonds, is that you said you had

24   settled with the manufacturers and that took care of the

25   downstream retailers.  But Sakar was paying the

1   attorneys' fees for these two downstream retailers

2   supposedly.

3                   So my question is, did the settlement of

4   these other manufacturers other than Sakar take care of

5   the two downstream retailers that he was referring to?

6                   MR. EDMONDS:  They did.  I really don't

7   know why Sakar was supposedly indemnifying them.  No

8   indemnity agreement was ever produced.  And Fry's, for

9   example, had its own counsel.

10                  So it is really not clear to me what was

11  going on there.  I was surprised when I saw the

12  attorneys' fees invoices that had invoices for other

13  parties.

14                  THE COURT:  Okay.

15                  MR. EDMONDS:  I am not sure what was

16  going on in the background.

17                  So at this point the sales -- the damages

18  against Newegg at this point with the exit of all of

19  these other manufacturers, the damages against Newegg

20  are $17,000.

21                  And AdjustaCam made a very reasonable

22  decision, strategic decision in the case, to say we

23  don't want to go to trial against a $17,000 defendant

24  and a much larger defendant, Sakar; Sakar who, by the

25  way, had not designated a damage expert in the case to

1  contest the damage model.  Newegg had.  They had a

2  damage expert who could contest the damage model Sakar

3  did not.

4           AdjustaCam made a reasonable strategic

5  decision that we want to dismiss Newegg so we can focus

6  our case on Sakar, and we want to go to trial against a

7  defendant who has no damages expert and who we think we

8  have a very good chance of prevailing against.

9           Both of these defendants refused to be

10  dismissed unless they got concessions, which we wouldn't

11  give them.  We thought that it was very reasonable what

12  we were doing at the time.  Ultimately we filed opposed

13  dismissals under the Super Sack case, which essentially

14  says if you covenant not to sue somebody then the Court

15  loses subject matter jurisdiction.

16           Ultimately, both of these defendants

17  agreed to be dismissed subject to what we are here for

18  today.

19           In the meantime as all this is going on,

20  the -- I am sorry.  So Sakar -- AdjustaCam is going to

21  trial against Sakar.  That is the way this case is

22  going.

23           Unfortunately, before that could happen,

24  the Patent Office came back after almost two years'

25  proceedings and came back with a final rejection of the

1  claims.

2          So when there is a final rejection of the

3  claims; and as it is of record with the Court, the

4  Patent Office said the asserted claims are -- we deem

5  them valid.  But there are a bunch of new and amended

6  claims that you have put them in, and we deem those

7  allowable.

8          AdjustaCam -- and it is here of record,

9  it is in our papers.  AdjustaCam had a choice.

10  AdjustaCam could appeal that decision which could

11  potentially take years and which could potentially

12  exhaust the remaining term of the patent, thus being

13  even if victory, a pyrrhic victory because prevailing

14  with the Patent Office at the end of the term of the

15  patent is no victory at all.

16          So AdjustCam again made a very reasonable

17  strategic decision based upon the reality of the

18  situation, that it cancelled the disallowed claims so it

19  could get a reexamination certificate so that if the new

20  and amended claims deemed allowable be allowed.

21          And quite reasonably AdjustaCam went to

22  Sakar and said:  It is your lucky day, Sakar.  The

23  Patent Office came back.  All of the claims have been

24  rejected.  We have cancelled them.  Our case against you

25  is moot, and we would like to dismiss you.

1                    And, of course, they didn't want to be

2     dismissed, and we hear them -- about them complaining

3     about all of these different things.

4                    That is the time frame to understand the

5     context of this.

6                    Could you go to the next slide?

7                    So in terms of why these entities were

8     dismissed, again -- and it is of record and I think the

9     evidence is clear for the Court, Newegg was dismissed

10    because its suppliers culminating in Gear Head and HP

11    had been dismissed; had settled.

12                   AdjustaCam, reasonably, wanted to go to

13    trial against Sakar who had significantly higher damages

14    and who had no damage expert to contest the damage

15    model.

16                   Unfortunately, after two years of

17    reexamination proceedings in which AdjustaCam was

18    successful by any measure in knocking out most of the

19    references and certainly prevailing on new and amended

20    claims, after two years it faced a hard choice of

21    canceling the rejected claims in order to get its patent

22    back from the Patent Office or potentially exhaust in

23    the patent on appeal.  And it made the choice of

24    canceling the claims, and that is why Sakar was

25    dismissed.

```
 1                    Sakar wasn't dismissed because there was
 2     a flaw in the infringement case.  Sakar was not
 3     dismissed because we think the patent is invalid.  Sakar
 4     was dismissed because the claims were cancelled and the
 5     only -- really only the most appropriate decision that
 6     would be made, given the amount of time left on the
 7     patent's life and how long an appeal would take.
 8                    Looking at the claim -- and we are
 9     focusing on this "rotatably attached" element -- the
10     Court -- I think I can try to boil it down with some
11     pictures to give the Court a better perspective on it.
12                    To a certain extent we have a battle of
13     the expert.  To a certain extent we have Counsel who
14     seem to be representing themself as an expert testifying
15     unsworn about kind of their opinions of infringement.
16                    But to start with, we have the "rotatably
17     attached" element, which is really the only one that is
18     at issue here.  And the Court construed "rotatably
19     attached" as:  Rotating about a single axis of rotation.
20                    And if you look at the pictures of these
21     webcams, and the Court now has -- these are very
22     similar.  These are the ones that were left in the case
23     after the case was trimmed down after Markman.
24                    And you can see it with the one that you
25     have.  There is a channel there that constricts the
```

1   movement of this appendage to the camera.  And the

2   channel is significant because it has to do with the

3   functional limitations upon these devices.

4             Go to the next one.

5             As set forth in the expert report of Mr.

6   Muskivitch and his deposition -- you know, Counsel for

7   Sakar keeps quoting from the deposition of the

8   plaintiff's expert and representing to the Court that is

9   a concession of non-infringement.  It just simply isn't.

10  Counsel for Sakar just simply doesn't understand the

11  patent and is just saying things and not really

12  understanding their context.

13            The deposition transcript is of record

14  with the Court, as is the report of Mr. Muskivitch.  Mr.

15  Muskivitch maintained -- or Dr. Muskivitch, excuse me,

16  maintained consistently and repeatedly and explained in

17  detail why his infringement analysis was sound, why it

18  was consistent with the Court's construction and why

19  from an engineering perspective and perspective of one

20  of ordinary skill in the art, it was entirely correct.

21            So I think what Counsel is saying

22  interpreting what they are saying is, is that Mr.

23  Muskivitch has said something that we think are a

24  concession of non-infringement; but Dr. Muskivitch never

25  conceded infringement.  The suggestion otherwise is just

1  another misrepresentation to the Court.

2              THE COURT:  What about doctrine of

3  equivalents?

4              MR. EDMONDS:  Well, I think that if there

5  was -- we didn't plead doctrine of equivalents because,

6  frankly, we didn't think we needed doctrine of

7  equivalents.  But in terms of if the Court is trying to

8  get its arms around this -- and I will show you in a

9  slide here why, frankly, what we are talking about is

10  just on all-fours with the preferred embodiment.

11              To the extent the Court wants to go

12  there, I think you could certainly say what we say is

13  literal, at a minimum would be equivalent.

14              THE COURT:  I'm asking did you allege

15  doctrine of equivalents?

16              MR. EDMONDS:  We did not.  No.  We

17  believe it is a literal infringement case and always

18  have.

19              But this restriction in the movement of

20  the joints, as Dr. Muskivitch has opined and explained

21  in his report and his deposition, results in two

22  functionally independent joints which have range of

23  movement that are independent of each other.

24              An analogy the Court might appreciate,

25  which Dr. Muskivitch, again, explained in his

1  deposition, which is of record with the Court, is that

2  here at my elbow I have two functionally independent

3  joints.  And I can twist my arm like this.  And that

4  movement is completely independent of the bending of

5  this elbow.

6              I can twist my arm, and I can bend my

7  elbow at whatever twist there is.  Or, conversely, I can

8  bend my -- I can twist at whatever bend there is.  They

9  are two functionally independent joints.  That is from

10  an engineering perspective.  That is foundational for

11  Dr. Muskivitch's opinion.

12             Frankly, what we have is a difference of

13  opinion between engineering experts as to whether that

14  is two functionally independent joints.  I don't think

15  what Counsel's arguing on that really matters at all.  I

16  think what matters for the Court, especially on

17  something as serious as this, is looking at the expert

18  opinions upon which AdjustaCam laid its foundation in

19  terms of a clearly sufficient basis for us to have

20  proceeded with the case.

21             What illustrates the point --

22             The next slide, please.

23             -- is, as you can see, the dramatic

24  similarity between the webcams that were left in the

25  case after the Markman and the preferred embodiment of

1  the -- that is set forth in the patent itself.

2                    And as you can see, the preferred

3  embodiment in the patent itself, as Mr. Sutton was

4  saying, it tilts and it pans just like my arm does, my

5  arm example, just like these cameras do.

6                    There is a functionally independent joint

7  that can tilt forward within that channel.  There is

8  also a functionally independent joint that can pan side

9  to side.  It is fundamental to how these cameras are.

10                   But we don't read the Court's Markman

11  ruling, and have never read the Court's Markman ruling,

12  and I think it would be improper to read the Court's

13  Markman ruling as excluding not only a preferred

14  embodiment but really the preferred embodiment in this

15  patent.

16                   And I think that what we have is that the

17  defendants, at least these two, have misread the Court's

18  claim construction opinion to exclude something that is

19  not excluded at all.

20                   And to illustrate the point, this is

21  Figure 2 of the patent.  So as you can see, the

22  preferred embodiment webcam, the 48 there where it has

23  the crop lines, is illustrating how the camera tilts and

24  then it also pans at whatever degree of tilt.  At

25  whatever axis of tilt that it is tilted at, it also

1  pans.  Or conversely however it is panned, it also tilts

2  as well; just like the infringing webcams and just like

3  the opinions of Dr. Muskivitch have set forth.

4           I also want to point out, this is another

5  slide I did on the fly; but it is actually from our

6  response.

7           Again, I think it illustrates how these

8  two defendants are just so fast and loose with the facts

9  with the Court.  And I think it is really a disservice

10  to this Court on such a serious motion.

11           And the first representation I heard was

12  from Counsel from Newegg who represented that HP had 29

13  million dollars in implicated sales, which was just

14  demonstratively false.

15           And then, secondly, Counsel for Sakar

16  represented multiple times to the Court that his

17  disassembled webcams -- of which he didn't bring all of

18  the pieces to Court -- have a ball.  If you remember he

19  said that many times.

20           That is not a ball.  That is a -- a ball

21  is round.  And, you know, I just don't understand why

22  the defendants can't be -- have more candor with the

23  Court as to what is really going on here.  Dr.

24  Muskivitch went in great detail in his report in

25  explaining these devices, how they move from an

1   engineering perspective and what was going on there.

2              We even have -- even today in this Court

3   we have Counsel who are shading the facts for the Court

4   trying to throw up some smoke here.

5              THE COURT:  Counsel, I'm running out of

6   time here.

7              MR. EDMONDS:  Yes, Your Honor.

8              THE COURT:  So if you can kind of wrap it

9   up, and I will hear very brief rebuttal.

10             MR. EDMONDS:  Thank you, Your Honor.

11             THE COURT:  I have another matter I have

12  got to get to.

13             MR. EDMONDS:  We have also pointed out,

14  and Counsel kind of testified how this was such a

15  cut-and-dry case and he knew from the beginning how we

16  were sunk in the Patent Office and how we'd never

17  infringe.

18             The record is that neither of these

19  defendants disclosed any non-infringement arguments in

20  their interrogatories.  Neither of these defendants

21  disclosed any non-infringement -- any factual basis for

22  non-infringement with their 30(b)(6) witnesses.

23             In fact, Newegg's Counsel refused to let

24  its witness even discuss non-infringement.  So in a case

25  that is supposedly so cut-and-dry that Counsel knew all

1  along they were going to win, I think it is telling they

2  were playing hide the ball with the plaintiff.  And I

3  think it is illustrative that it is not as cut-and-dry

4  as they think.

5              On this validity issue -- if you turn to

6  the next slide, I will speed through this.

7              This discussion of Irifune, and it is set

8  forth in detail in Dr. Muskivitch's validity report,

9  Irifune -- the problem with Irifune and the reason why

10  it falls short as an invalidating reference, is that it

11  has to be rotatably attached.

12              And as Dr. Muskivitch explained in his

13  report, with Irifune it can either be attached or it can

14  be rotatable; but it can't rotatably attached because it

15  has this loose attachment -- or this connection via

16  screw 9.

17              And to understand it, it is because it

18  loosely fits through this passage in this arm 2.  It is

19  not attached to it at all when it is not screwed down.

20  And when the camera is screwed down, it doesn't rotate

21  at all.

22              You know, that argument was ultimately

23  unpersuasive with the Patent Office, but it is certainly

24  a good-faith argument.  In fact, if the Court will read

25  Dr. Muskivitch's report, I think the argument is

1  compelling.

2                    Finally, the last two slides.  I already

3  went through about the misstatements of the -- one

4  more -- about the HP license.  The criticism of Mr.

5  Bratic's report -- the problem with this criticism of

6  Mr. Bratic's report is the defendants failed to account

7  for the fact that AdjustaCam was not collecting

8  royalties for pre-suit sales because there had been no

9  marking.

10                    In fact, during the Court proceedings we

11  readily conceded there had been no marking.  So that is

12  a fatal flaw in these inflated estimates they have of

13  why the Bratic report numbers are wrong.

14                    They also failed to account for the fact

15  that when some defendants settle, downstream defendants

16  now don't have to pay as much.  A good example is HP who

17  because its overseas suppliers settled, got an excellent

18  deal where it sales were diminished to almost nothing.

19                    It also includes linear sales projections

20  when their own expert said that sales were dropping

21  dramatically in this industry.

22                    Lastly here, as far as the Rule 11

23  violation, again, misstatements about what was said by

24  the 30(b)(6) designee.  The 30(b)(6) designee said we

25  depended on our Counsel to do the Rule 11 analysis, and

1   our Counsel did a Rule 11 analysis.  The never said a

2   Rule 11 analysis was never done.  That is just a

3   misstatement to the Court, and the cites from the

4   deposition are in the record.

5                   And they testified that a Rule 11

6   analysis was done.  When our Rule 11 analysis was

7   challenged, we put forth sworn proof that we did a

8   proper Rule 11 analysis.

9                   No one has said that what is in the

10  declaration does not amount to a proper Rule 11

11  analysis.

12                  And then, finally, these analogies to the

13  Eon-Net case are completely misplaced.  There has been

14  no shake-down here.  The settlement numbers were

15  reasonable.  There has been no showing that the

16  infringement case was flawed.  There has been no showing

17  that the validity case was flawed.

18                  What we have here is we have a case that

19  licensed a large number of defendants based on a very

20  reasonable settlement metric that has the backing of a

21  competent damages expert who made a competent report.

22                  We have the infringement theory that has

23  the backing of a competent expert who has a competent

24  report.

25                  There has been no showing of any bad

1  faith.  There has been no showing of any objective bad

2  faith.  There certainly has been no clear and convincing

3  evidence that any bad faith has happened here.

4              Not all cases end with success with the

5  plaintiffs especially when the Patent Office isn't

6  cooperative.  But that does not make the case

7  exceptional.

8              Thank you, Your Honor.

9              THE COURT:  Thank you.

10              Response?

11              MR. ZARIAN:  Thank you.  Briefly, Your

12  Honor.  If I may use the Elmo.

13              Your Honor, just a handful of points

14  while we pull that up.

15              First, Your Honor, there is no rational

16  connection whatsoever between the settlements that have

17  been obtained in this case and this litigation and any

18  target royalty rate.

19              I just want to underscore that.  We have

20  laid this out in our papers, Your Honor, but the imputed

21  royalties -- and we have undertaken to determine these.

22  The other side has not -- range from ten cents a unit to

23  $161 per unit.

24              The Hewlett-Packard example is actually

25  instructive.  There were 29 million dollars in sales.

1   Plaintiff would excuse a $25,000 settlement with HP on

2   the strength of two other settlements.  And this is at

3   the 150, et seq of Mr. Bratic's deposition.

4           Well, those two other defendants settled,

5   and that presumably included other units, for $165,000

6   respectively.  That covered 98 percent of the units that

7   HP sold and, presumably, other units as well.

8           And yet the 8,000 remaining units were

9   settled ostensibly for 25,000.  There is no way to

10   square that.  There is no way to reconcile any of those

11   figures to a target royalty range.

12           The only way to reconcile and understand

13   the settlements reached in this case is that they were,

14   in fact, reached by reference to nuisance value and the

15   value that could be extracted in every case through

16   litigation, including those first two settlements with

17   Philips and Logitech which were also in litigation.

18           Secondly, Your Honor, there is no way to

19   get around the fact that the infringement argument in

20   this case was baseless from the outset.  We have a

21   ball-and-socket joint -- and this is a printout, but the

22   Court saw the original when it was electronically shown

23   to the Court during plaintiff's presentation.

24           There is a ball-and-socket joint.  And

25   the fiction that was adhered to throughout this case

1  relentlessly was that that ball-and-socket joint was

2  really two fundamentally independent joints.  That was

3  the only way to try to square the reality of this

4  product with the claims.  And it was baseless and

5  frivolous from the start.

6            Page 8, Your Honor, of our brief maybe

7  has a better picture that clearly shows that we have a

8  ball-and-socket joint here.  There is no way to argue in

9  good faith that that is something that rotates or causes

10 the camera to rotate about a single axis of rotation.

11 There is no question that was what the claims in this

12 case required.

13            Finally, Your Honor, I won't touch on the

14 invalidity issues which Counsel for Sakar I think

15 covered very well; and those, too, serve to make this

16 case baseless and unmeritorious from the very outset of

17 the litigation.

18            But the last point I want to make, Your

19 Honor, is that the inference is inescapable that

20 plaintiff knew that it had advanced a baseless theory of

21 infringement certainly as to Newegg's cameras.

22            Some of these facts have been covered.

23 But to summarize, there were 16 cameras dropped,

24 apparently, we are told after claim construction.  We

25 have never been told exactly which ones those are.  But

1   presumably they were ball-and-socket configurations

2   likes ours.

3                       We know about the HP settlement.  No way

4   to square that with any rational basis or a target

5   royalty rate.

6                       The day before the technical expert for

7   the plaintiff is set to be deposed, it is that very

8   day -- the day before, that Newegg is approached about

9   dismissal.  And only on that day, again, after experts

10  have been deposed and reports have been placed in

11  evidence, that a new expert report is produced by their

12  technical expert.

13                      The timing, again, makes it crystal clear

14  that plaintiff had to know that it was advancing and had

15  been advancing an entirely baseless theory of

16  infringement.

17                      And it was only when it became clear that

18  Newegg would put plaintiff to its proof and hold it

19  accountable, that in desperation they first tried to get

20  the case dismissed and then to come up with an entirely

21  novel, entirely novel theory of infringement never

22  before disclosed in this -- on August 24th of 2012.

23                      And these circumstances, these facts, and

24  this timing, Your Honor, make it inescapable to conclude

25  and infer that plaintiff had knowledge of the baseless

1   nature of its claims and had that knowledge as to

2   Newegg.

3                    And for that reason and for the other

4   reasons that we have reviewed and discussed in our

5   papers, Your Honor, this is an exceptional case; and a

6   fee award under Section 285 is appropriate.

7                    THE COURT:  All right.  Thank you.

8                    MR. SUTTON:  Your Honor, can I just take

9   one minute?

10                    THE COURT:  All right.

11                    MR. SUTTON:  One important thing is, Your

12   Honor --

13                    THE COURT:  Counsel, go to the podium, if

14   you would, where you can speak into the microphone.

15                    MR. SUTTON:  Okay.  Your Honor, I must

16   contest what Mr. Edmonds said when he said that Sakar

17   was not dismissed because of the Patent Office

18   rejection.

19                    I don't know how he can say that to the

20   Court.  We were -- as soon as they got their final

21   rejection in September 2012, I wrote him a letter saying

22   we are going to introduce that rejection, final

23   rejection in the evidence at the trial.  About a week

24   later he submitted a dismissal with regard -- he wanted

25   to get Sakar out of the case because he had no more

1  case.

2              Also, the other thing I must refute is I

3  would like to hand Your Honor three pages to save Your

4  Honor a lot of time.  These are the three simple quotes

5  from Dr. Muskivitch's report.  They are Appendix A, B,

6  and C to my brief.

7              Mr. Edmonds has them.  I would like to

8  hand them up to Your Honor because one page -- two of

9  the pages show non-infringement by their own expert.

10  And the third page shows Irifune making the patent

11  invalid and his expert is agreeing.

12              If I may, I would like to hand these up

13  to the Court.

14              THE COURT:  You may.

15              MR. SUTTON:  They are the exact quotes

16  from the depositions.

17              THE COURT:  All right. You may hand them

18  up to Ms. King.

19              And let me ask both sides to provide the

20  Court with a copy of your slide presentations that you

21  have provided.

22              Anything further?

23              MR. SPANGLER:  Nothing from the

24  plaintiff, Your Honor.

25              THE COURT:  From defendants?

```
 1                  MR. ZARIAN:  No, Your Honor.

 2                  MR. YARBROUGH:  No, Your Honor.

 3                  THE COURT:  All right.  Thank you.  Be

 4  adjourned.

 5                  (Hearing adjourned.)

 6

 7                      CERTIFICATION

 8

 9                  I HEREBY CERTIFY that the foregoing is a

10  true and correct transcript from the stenographic notes

11  of the proceedings in the above-entitled matter to the

12  best of my ability.

13

14  /s/ Shea Sloan
    SHEA SLOAN, CSR, RPR
15  Official Court Reporter
    State of Texas No.:  3081
16  Expiration Date:  12/31/14

17

18

19

20

21

22

23

24

25
```