```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE EASTERN DISTRICT OF TEXAS

 3                         TYLER DIVISION

 4   ADJUSTACAM                      )(

 5                                   )(    CIVIL DOCKET NO.

 6                                   )(    6:10-CV-329-JRG

 7   VS.                             )(    MARSHALL, TEXAS

 8                                   )(

 9                                   )(    JANUARY 26, 2016

10   AMAZON.COM, ET AL.             )(    1:40 P.M.

11                        MOTION HEARING

12          BEFORE THE HONORABLE JUDGE RODNEY GILSTRAP

13                UNITED STATES DISTRICT JUDGE

14   APPEARANCES:

15

16   FOR THE PLAINTIFF:  (See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
17

18   FOR THE DEFENDANTS: (See Attorney Attendance Sheet docketed
                          in minutes of this hearing.)
19

20   COURT REPORTER:     Shelly Holmes, CSR-TCRR
                          Official Court Reporter
21                        United States District Court
                          Eastern District of Texas
22                        Marshall Division
                          100 E. Houston
23                        Marshall, Texas   75670
                          (903) 923-7464
24

25   (Proceedings recorded by mechanical stenography, transcript
     produced on a CAT system.)
```

1                                I N D E X

2

3       January 26, 2016

4                                                        Page

5            Appearances                                 1

6            Hearing                                     3

7            Court Reporter's Certificate                62

```
 1              COURT SECURITY OFFICER:  All rise.

 2              THE COURT:   Be seated, please.

 3               All right.  This is the time set for hearing before

 4   the Court on a motion by Defendant, Newegg, et al., to declare

 5   the case exceptional and award fees and expenses.  Likewise,

 6   there's a companion motion by Defendant, Sakar International,

 7   for the same purpose.  This is in the AdjustaCam versus Amazon,

 8   et al., case, Case No. 6:10-CV-329.

 9              Let me call for announcements on the record at this

10   time.  What says the Plaintiff?

11              MR. SPANGLER:  Your Honor, good afternoon.  Andrew

12   Spangler on behalf of the Plaintiff.  With me today is

13   Mr. Charles Van Cleef, Mr. John Edmonds, Mr. Steve Schlather.

14   And like we told the Court earlier, with us today also is

15   Dr. Muskovitch and Dr. Bratic, and they're available if the

16   Court wishes for them as a resource.  We are ready to proceed.

17              THE COURT:  All right.  What are the announcements

18   from the Defendants, starting with Newegg?

19              MR. FRENKEL:  Your Honor, Richard Frenkel for Newegg,

20   and with me in the courtroom is Lee Cheng from Newegg.

21              THE COURT:  All right.  And the announcement from

22   Sakar?

23              MR. CRAFT:  Good afternoon, Your Honor, Brian Craft.

24   I'm here on behalf of Sakar International, and I wanted to let

25   the Court to know Mr. Ezra -- Ezra Sutton, who is lead counsel,
```

1   apologizes for not being able to get out of the East Coast

2   because of the snow storm, and he could not make it down, but

3   I'm here on his behalf.

4          THE COURT:  Well, he's ably represented.

5          MR. CRAFT:  Thank you.

6          THE COURT:  Thank you.

7          Okay.  These are obviously motions proffered by the

8   Defendants.  The Court is aware of the record in this case.

9   The prior decision by Judge Davis as well as the opinion of the

10  Federal Circuit remanding this for consideration of the issues

11  before the Court today.

12         Let me hear argument from the Defendants first,

13  starting with Newegg.

14         MR. FRENKEL:  Thank you, Your Honor.  And as I

15  indicated -- as Mr. Craft indicated, he'll be also coming up

16  and presenting some argument on behalf of Sakar.

17         I'm here to address the '343 patent case, which Newegg

18  was eventually dismissed from, but the case should not have

19  been brought from the beginning.  All the claims in the '343

20  patent are structural claims.  They have specific limitations.

21  They refer to having a hinge member that's rotatably attached

22  to a camera that rotates around a first axis and a support

23  frame that's rotatably attached to a hinge member about a

24  second axis of rotation.  All of the written descriptions, all

25  of the figures of the patents, all of the claims, every single

1  word describes a camera that rotates in one direction about

2  hinge from left to right, and then a hinge that rotates up and

3  down about a frame.

4        In that way, the camera that was -- again, the patent

5  which was filed back in 1997, and that way the camera can see

6  everything.

7        Now, the patentee could have structured his claims

8  differently.  As this Court knows, it's seen all sorts of

9  claims that are broader, but these claims are very specific,

10  they're very specific structural limitations, and ones that are

11  not found in the Newegg and Rosewill products.  Rosewill is the

12  Newegg brand.  They're not even close.  This case should not

13  have been brought.

14        But beyond that, when Judge Love issued his Markman

15  order in April 2012, which was soon affirmed by Judge Davis, it

16  very clearly pointed out that when the claims used the term

17  rotatably attached, that means it's limited to a single axis of

18  rotation.  There should not be any doubt.  In fact, Judge Love

19  went beyond that and said, the parties may not contradict the

20  Court's resolution of that dispute over the term rotatably

21  attached.

22        So at least -- at least as of that moment, there

23  should have been no dispute that rotatably attached was limited

24  to a single axis of rotation.  And that was a problem here

25  because what Newegg believes happened is that AdjustaCam did

1    contradict that order when it proceeded in the case against

2    products that rotated under a ball and socket joint, and the

3    ball and socket joint is very simple.  It rotates in many

4    different axes, and they move up and down and around.

5           Now, AdjustaCam argued and Dr. Muskovitch argued

6    that it was a constrained rotation, much like if I turn my neck

7    to the side, I can't turn it all the way around 360 degrees

8    like -- like the doll from the movie Chucky, but I'm still

9    rotating around many different axes, if I can go up and down

10   and left and right.  And that's exactly what the ball and

11   socket joint of the camera did.

12          There -- there should be no way that that case should

13   have proceeded past -- past claim construction, and Newegg

14   submits that given no contradiction of the intrinsic record,

15   that case should never have been brought in the first place.

16          Now, AdjustaCam appealed the claim construct to the

17   Federal Circuit after it had dismissed its claims against

18   Newegg, which the Federal Circuit found to be wrong.  But the

19   reason why we believe AdjustaCam appealed that claim

20   construction is because they know that under that claim

21   construction, there's no way that there's infringement.

22          Now, under Octane Fitness, the Court should look at

23   the record as a whole, and this is one part of it.  The

24   first -- certainly it's an important part of it.  There's -- in

25   granting attorney's fees, there has to be a frivolous case, but

1   in combination with that here, we get also the licensing

2   practices of AdjustaCam.

3              And we submit that this case is just like the MarcTec

4   case, which we cited in our briefs, where there's no

5   evidentiary support for the case in the first place, and the

6   decision to continue the litigation after an adverse claim

7   construction.

8              And before I get to the licensing issue, I do want to

9   address the arguments --

10             THE COURT:  Let me -- let me ask you a question,

11  counsel.

12             MR. FRENKEL:  Sure.

13             THE COURT:  Are you telling me that the Court must

14  look outside of the record and consider the practices of the

15  parties, in this case, the Plaintiff, with regard to other

16  cases, unrelated cases, their approach to litigation as a

17  whole, or am I confined to the four corners of the record in

18  this case?

19             MR. FRENKEL:  I think, Your Honor, you're -- you're

20  confined to the record in this case.

21             THE COURT:  All right.  I thought I heard you say I

22  should take into account their litigation practices in other

23  areas, but maybe I misunderstood you.

24             MR. FRENKEL:  No, I think maybe you -- when I said

25  licensing practices, and I'm going to get to that, and what I'm

```
 1   referring to is the licensing practice in this case --

 2           THE COURT:  All right.

 3           MR. FRENKEL:  -- relating to this patent.

 4           THE COURT:  That clarifies it.

 5           MR. FRENKEL:  I apologize if I miscommunicated that,

 6   Your Honor.

 7           THE COURT:  Go ahead.

 8           MR. FRENKEL:  All right.  So before I get to that, let

 9   me just address really quickly what AdjustaCam argued on the

10   merits, at least in response to Newegg's fees's motion.

11           First, they -- they -- they argued that Newegg waived

12   the -- the ability to argue anything on remand on the merits

13   because Newegg never challenged Judge Davis or Judge Love's

14   opinions for clear error.

15           And I just want to point out that that's not true.

16   Newegg did argue to the Federal Circuit that there was clear

17   error.  In fact, the abuse of discretion standard that's set by

18   the Supreme Court in the Highmark case says that there's abuse

19   of discretion if there's a clear error of law or clear error of

20   fact.  And Newegg did argue in its brief, and we pointed out in

21   our reply brief here, where we are argued to the Federal

22   Circuit that there was clear error.

23           And the second case that AdjustaCam points to is the

24   Biax decision, which is an unpublished Federal Circuit case

25   where attorney fees were reversed and where Nvidia had gotten
```

1    attorney's fees on appeal, and the Federal Circuit reversed

2    that.  And the reason why that was reversed in Biax is because

3    in that case, there was an ambiguity in claim construction that

4    didn't get resolved until summary judgment, but there's no such

5    situation here.

6         Judge Love's opinion was unambiguous about what it

7    meant to be rotatably attached about a single axis of rotation,

8    and there was never any argument that that was ambiguous.

9         THE COURT:  And how -- how long were -- how long was

10   Newegg in the case after the claim construction order came out?

11        MR. FRENKEL:  Your Honor, the claim construction order

12   came out in April of 2012.  I don't have the exact date here,

13   but I believe it was another four or five months after that.

14        THE COURT:  And you were -- your client was dismissed

15   at that point?

16        MR. FRENKEL:  Right.  What happened was originally

17   AdjustaCam wanted to dismiss its claims against Newegg with

18   prejudice and dismiss Newegg's counterclaim with prejudice.

19   Newegg opposed that because they wanted to preserve the right,

20   if they were ever sued again, to be able to assert

21   counterclaims, and eventually AdjustaCam did dismiss its claims

22   against Newegg with prejudice and the counterclaims without

23   prejudice.  And so at that point, Newegg was -- was out, and,

24   you know, there's -- you know, after there is a covenant not to

25   sue, the litigation doesn't go forward.  So Newegg never had

1   the opportunity to try to vindicate itself and win the case.

2          All right.  So turning to the licensing campaign here,

3   when you actually look at these agreements, as the Court can

4   do, by the way.  I know that AdjustaCam said that it's improper

5   to look at settlement agreements because it violates the

6   mediation privilege, but the Federal Circuit said that it's

7   proper, in In re: MSTG, for the district courts to look at

8   settlement agreements in cases like this.

9          And we believe that the pattern here is very similar

10  to the pattern that was found Eon-Net and that this Court found

11  in the recent eDekka decision.  And that if you look at the 22

12  Defendants who settled, you know, 14 -- they're all for round

13  numbers, and 14 of them are for $50,000.00 or less.  And that's

14  in the -- the Bratic -- I'm sorry, the Sullivan report, which

15  was at Docket entry 728, Exhibit 6, and Attachment 7 to that.

16         And if you look at that, you see a pattern of all low

17  value settlements not tied to any actual revenue.  Now,

18  AdjustaCam argued that what they were really trying to do is

19  have a licensing campaign tied to a royalty rate of $1.25 to

20  $1.50.  But if you look at Attachment 12 from that same report

21  at the same site that was mentioned, the settlement ranged all

22  over the place.  It was scattered all the way up to $161.00 per

23  unit.  And so there really was no campaign to get to $1.25 to

24  $1.50.  These were all low value numbers to avoid litigating

25  the patent on the merits.

1          Now, AdjustaCam points to a couple of things in

2    response to that.  One is they point to a handful of licenses

3    where there was a low lump sum number, but then once a certain

4    number of units were triggered, were sold, were -- if that

5    threshold is triggered, then $1.50 royalty would kick in.

6          But even, you know, AdjustaCam's expert in his report,

7    which AdjustaCam put into the record at Docket 736, Exhibit 11,

8    that's the expert report, and I'm talking about Paragraph 69

9    of Mr. Bratic's report, he said that the -- that AdjustaCam had

10   set the -- the values of the licenses so high that it would be

11   unlikely that the threshold would be exceeded.

12         And so if you take the example that we put in Footnote

13   1 of our reply brief, it was a license that had a $20,000.00

14   lump sum but an ongoing royalty of $1.50 per unit after sales

15   reached 13,333 units.  But the problem there is that licensee

16   had only ever sold 130 units at the time of the agreement.  And

17   so that's an effective royalty rate of $153.00 per unit, not

18   $1.50.  And to reach that range, that licensee would have had

19   to sell over 20 times its past volume of sales every year for

20   the rest of the life of the patent.

21         And so we think that these thresholds that were set in

22   some of these agreements were just there to make them look like

23   they were ongoing royalties, but in no way did anyone ever

24   expect that ongoing royalties would be reached, and, again,

25   there's no evidence in the record that there were any ongoing

1   royalties for any of those.

2          Now, AdjustaCam did put some evidence in the record,

3   Mr. Edmonds in his sur-reply put in a declaration that pointed

4   to some royalty provisions from a license that a predecessor

5   had with Logitech.  Let me talk about that for a minute.  The

6   predecessor was a company from Phoenix named PAR, and they sued

7   Logitech and entered into an agreement with Logitech back in

8   2001.  2001 is a very different time period.  It was at the

9   very early stages when there were webcams, and cameras like

10  these were probably very prevalent.  For all we know,

11  Logitech's accused device had a single axis of rotation.

12  There's no evidence in the record to show why that license is

13  relevant here.  And in any case, there's no doubt here --

14  there's no dispute that the hypothetical negotiation in this

15  case is not in 2001.  It's in 2006.

16         So we don't believe the Logitech agreement, the fact

17  that a predecessor entered into it proves anything.

18         By way of analogy, imagine that someone had a patent

19  on dial-up modems, and they sued a bunch of companies back in

20  1999 or 1998 when dial-up modems were really prevalent.  That

21  patent may have been worth a lot then.  But they take -- if

22  someone else takes that patent years down the road and tries to

23  assert it against a totally different technology, like cable

24  modems, for example, and the claims are clear enough that it's

25  clear that they can't be asserted, then, you know, just because

1   that patent was licensed before and valuable against a

2   different technology doesn't make it's relevant to a campaign

3   that's frivolous down the road.

4        All right.  So when you look at the total of

5   circumstances here, as the Supreme Court did in Octane, which

6   is what, you know, the district courts are to do, look at the

7   totality of the circumstances, we believe we have a combination

8   of a case that should have never been brought on the merits,

9   should not have continued after the claim construction order,

10  and was really there to extract nuisance value settlements, and

11  did against a lot of Defendants.

12       Newegg's been widely criticized for -- including in

13  the briefs here for -- for seeking fees, but Newegg doesn't do

14  it in all the cases.  In our reply brief, we pointed out many

15  cases where Newegg has settled and not -- including in this

16  district, and not brought fees motions.  But Newegg has the

17  right to defend itself, and when it does get sued in a case

18  that is not even close on the merits, it has the right to seek

19  fees, because that's the only way to level the playing field

20  here, because most other companies, when -- when sued on a

21  patent like this, and offered a chance to settle it for

22  $50,000.00 or spend well over 10 times that amount in trying to

23  fight it and eventually get fees are going to pay the money and

24  walk away.

25       And so there's nothing wrong with that, Your Honor.

 1   And I think that on the record here, Newegg does deserve fees.

 2        Thank you.

 3        THE COURT:  All right.  Let me hear -- let me hear

 4   from Sakar next.  I assume it will be much the same argument,

 5   but once I've heard from both Defendants, then I'll hear a

 6   response from Plaintiffs.

 7        MR. CRAFT:  Your Honor, you're correct in that.  Sakar

 8   would adopt the same arguments that are made by Newegg.  It's

 9   essentially the same functionality in the products, the way it

10   works.  We also believe that the case never should have been

11   brought against the Kodak camera that's been accused that Sakar

12   was offering.

13        And in addition, certainly once the claim construction

14   order came out from Judge Love in April, it made itself very

15   clear that the products would not meet the claim elements.  So

16   we would agree with the arguments that Mr. Frenkel made and

17   adopt those, and the same argument's to be made as to the

18   damages issue.

19        THE COURT:  Let me ask you a question, Mr. Craft,

20   obviously, this case was filed in another division before I

21   ever came on the bench, so I'm coming to this party rather

22   late, and I'm aware of that.

23        But in trying to determine what the appropriate way to

24   approach this issue is, not only have I reviewed the record and

25   the briefing, but I reviewed carefully the decision by the

1    Federal Circuit which sent this case back, and at the

2    conclusion of their opinion, the Federal Circuit says, we

3    decline to substitute our judgment for that of the district

4    court in applying these new standards in the first instance.

5    Accordingly, we remand for reconsideration in light of Octane

6    Fitness.  And then they drop Footnote No. 2.  And Footnote

7    No. 2 says:  We note, however, that Newegg and Sakar's

8    arguments appear to have significant merit.

9              How am I, as a trial judge, supposed to take that?  Am

10   I supposed to say, okay, they've told me they really weren't

11   going to decide, but they've told me in the foot note what I

12   need to do, and am I bound by that?  Or am I to disregard that,

13   and can I disregard that safely knowing that I won't be held to

14   it if my personal determination of the totality of the

15   circumstances should differ from what's indicated in the

16   footnote?  What's -- what's your position on how the Court

17   should properly respond to a communication like this?

18             MR. CRAFT:  Well, Your Honor, I believe the -- at the

19   time that Judge Davis had the case, he was operating under

20   Brooks Furniture --

21             THE COURT:  I'm well aware --

22             MR. CRAFT:  -- in a case with a different standard.

23             THE COURT:  I'm well aware of the change of the

24   standard under Octane Fitness.

25             MR. CRAFT:  Right.  And so --

```
 1          THE COURT:  But to say on one hand, we're not going to
 2   rule on this, we're going to send it back, and we won't usurp
 3   the district court's decisionmaking authority, but, oh, by the
 4   way, this is what we think the result should be, that's a
 5   bazaar combination, at least in my experience, it is.  And I'm
 6   looking for guidance from everybody in the courtroom as to how
 7   properly to construe that and apply it in the context in which
 8   I now find myself.
 9          MR. CRAFT:  And I understand.
10          THE COURT:  That's my question to you.
11          MR. CRAFT:  I understand that, Your Honor.  And -- and
12   it is quite bizarre, I would agree with you on that.  But I
13   think, you know, Plaintiff leads off basically with the
14   argument that whatever Judge Davis found is almost what you
15   have to find in this case, and I don't believe that's the
16   situation.
17          I think you have the discretion to look at the
18   totality of the circumstances, like the Octane case indicates,
19   and to view it under the new standard and burden of proof that
20   Octane provides for us, and you can review all the evidence
21   yourself.
22          Now, the Federal Circuit, I guess, is giving some
23   guidance from -- from their review that there is some merit to
24   it, but they are not making the determination at the time under
25   this new standard as to whether or not it fits or not.
```

1          We believe it does, and we believe once, you know,

2   Your Honor has the opportunity to go through everything, that

3   you will also see that it fits this lower burden and -- and

4   lesser standard under Octane than was previously the law under

5   Brooks Furniture.

6          THE COURT:  I assume this is -- since it was filed in

7   2010, I assume this is a pre-AIA case and that the various

8   Defendants who settled out were all part of the same lawsuit

9   and not separately filed, serially filed Defendants as we have

10  in the post-AIA world; is that correct?

11         MR. CRAFT:  That's correct, Your Honor.

12         THE COURT:  So considering the totality of the

13  circumstances would perhaps incorporate the totality of those

14  circumstances as applied to the other Defendants because

15  everybody's in the same lawsuit?

16         MR. CRAFT:  That is correct, Your Honor.

17         THE COURT:  All right.  Thank you, Mr. Craft.  Do you

18  have anything else for me?

19         MR. CRAFT:  No, thank you.

20         THE COURT:  Let me hear a response from the

21  Plaintiffs.

22         MR. EDMONDS:  Thank you, Your Honor.  John Edmonds

23  here for the Plaintiff, AdjustaCam.

24         What I -- what I wanted to do was the same thing I did

25  with -- with Judge Davis, seems like it's a couple years ago

 1   now, was walk you through the timeline of this case.  And I

 2   think that you can get a -- a better feel or understanding for

 3   how this case rests.

 4        Sorry, my clicker is not working, so we're going to do

 5   it manually.

 6        This case has a long timeline.  It goes back to 2001.

 7   So there's -- there's a license to Phillips for this -- for

 8   this very patent for -- for royalties.  They start at $2.00 a

 9   webcam, and then they go down to a dollar, so we say they're

10   averaging $1.50 a webcam.

11        My -- did your screen go blank, Your Honor?

12        THE COURT:  It did.

13        MR. EDMONDS:  My screen just went blank.

14        THE COURT:  Now it's back.

15        MR. EDMONDS:  We -- we also have handouts, but it's

16   not back up.  My colleague, I think, will --

17        THE COURT:  Counsel, I think this is on your end.

18        MR. EDMONDS:  Okay.  Yeah, no doubt about that.  Okay.

19        Very soon thereafter, PAR licenses Logitech for $1.25

20   a webcam for the first two million.  It was a very significant

21   license.

22        Along the way, AdjustaCam acquired rights, and this

23   lawsuit is filed.  And you're right, this was a pre-AIA

24   lawsuit, so there was a significant number of Defendants, but I

25   think this should be judged back in -- in the standard of the

```
 1   time.  We don't -- that's -- post-AIA, things are done -- are
 2   done differently.
 3           THE COURT:  Well, my point, counsel, was -- and
 4   I'll -- I'll welcome whatever your argument on this would be,
 5   is, clearly, the Supreme Court in Octane Fitness told trial
 6   courts such as this to consider the totality of the
 7   circumstances.  And in a pre-AIA case with multiple Defendants,
 8   is it appropriate for me to consider the circumstances of all
 9   those other co-Defendants, or am I limited to the circumstances
10   that existed between this Plaintiff and that -- and these
11   moving Defendants?
12           MR. EDMONDS:  I -- I think that you're -- under the
13   totality of the circumstances, that you need to consider the
14   facts that you have and -- and not a bunch of lawyer argument
15   speculating about settlements that they don't know about.
16   And -- but -- and the most important facts would be these
17   Defendants here, and we actually have the settlement
18   negotiations with Newegg, which as the record reflects were
19   $1.50 a webcam.
20           And -- and the facts that the Court has from the --
21   the declaration of Mr. Bratic, our expert, from the test --
22   from the 30(b)(6)test -- testimony of AdjustaCam's 30(b)(6)'s
23   designee, Mr. Haynes, is that this $1.25 to $1.50 benchmark was
24   used as the benchmark for all these settlements, and that --
25   and that the numbers are small on these settlements because
```

1   webcams just aren't that popular anymore.  Actually, the

2   numbers -- when I say these settlements, the numbers are small

3   on some settlements.

4         Logitech ended up -- ended up paying $3.8 million,

5   which is a very significant sum, and I'll get that -- to that

6   in just a minute.  But not all the settlements were small.  In

7   fact, the -- the -- the breadth of the settlements is

8   indicative of them having a rational basis and being tied to --

9   to units, and not something that was just made up.  But I'll

10  get to that in a minute, too.  I'm just taking you through the

11  timeline now.  But it was a fair question.  Did I -- did I

12  address it satisfactorily?

13        THE COURT:  Well, I think so.  I mean, my view is that

14  when the Supreme Court says the totality of the circumstances,

15  that means everything within the four corners of that lawsuit.

16  It stops at the four corners of that lawsuit, and I don't think

17  it's appropriate for me to look at the conduct of your client

18  outside of this lawsuit or the conduct of the Defendants

19  outside of this lawsuit.

20        But whatever's happened within the four -- the four

21  corners of this lawsuit probably falls within the totality of

22  the circumstances, at least as I understand it.  If you have a

23  different view, I'd like to hear that.

24        MR. EDMONDS:  No, I agree with that, as long as -- as

25  long as it is the facts and not just speculation.  I'll just

1  say that there's a mention of -- of what occurred on appeal.

2  That was -- that was addressed by the appellate court.  I do --

3  I don't think that's part of the scope of this proceeding.

4         You know, there -- there were good faith reasons for

5  the -- what, in effect, was a cross appeal, and the cross

6  appeal essentially said that Newegg and Sakar are

7  misinterpreting the Court's ruling, and so we're appealing as a

8  matter of prudence, and the Federal Circuit didn't like that

9  that, and it is what it is, but that's not part of this

10  district court's proceedings.  So I don't think that's

11  relevant.  That was addressed by the Federal Circuit.

12         THE COURT:  All right.  Why don't you continue with

13  your argument?

14         MR. EDMONDS:  Okay.  So -- so this lawsuit proceeds

15  and -- and so the settlements that -- that my colleague here

16  was talking about -- so there are six settlements, they're for

17  relatively small amounts, but what's significant about them is

18  that each one of them was -- was negotiated at arm's length

19  with a Defendant.  There's no collusion here.  There's no --

20  this is an arm's length settlement.  And the parties said if

21  you get to this threshold, you're going to have to pay $1.50

22  per webcam going forward.  And there was testimony that the

23  number that was arrived at was -- was targeted at the $1.50

24  royalty.

25         So, yes, the number is low, but I'm sure the Court

1  appreciates, if somebody's sales are low, the settlement number

2  is going to be low.  And -- and I think that it's an odd

3  circumstance here when Newegg comes in -- in eDekka and these

4  other cases that we've seen these nuisance value settlements,

5  the -- the situation seems to be that if this -- if this patent

6  was really infringed, the Defendant would have paid millions.

7  And so when they pay some small amount -- and so the -- the

8  conclusion from that is, well, it must be -- it must be a

9  nuisance value case, it must have no merits because who would

10  settle for millions of dollars for, you know, low five figures.

11       In this case, they're making a different argument.

12  They're saying, well, some -- some of these Defendants paid too

13  much.  They really shouldn't -- but we think they paid more

14  than $1.50 per webcam.  They just don't know what they're

15  talking about because they don't have the facts.

16       The only facts before the Court are the sworn 30(b)(6)

17  of Mr. Haynes, which is in the record, and the deposition

18  testimony of our expert, Mr. Bratic, which is in the record,

19  and the report of Mr. Bratic.

20       They point to this Exhibit 12, which is some numbers

21  that their damage expert put together.  There's -- there's no

22  explanation in the record of the methodology for this.  As a

23  matter of fact, the record shows that they refused to produce

24  the backup because they claimed it was privileged.  So we just

25  have some numbers on a page that counsel gets up here and

1   argues, oh, their settlement numbers are skewed.  Look, none of

2   them match up, but they don't -- they don't have any facts to

3   back it up.  It's just an argument.  It's just a piece of

4   paper.

5           As the case proceeds, re-examination commences.  In

6   2006 -- and the case continues to proceed.  There are 14 more

7   settlement agreements.  The evidence before the Court, again,

8   the only evidence before the Court is that those settlement

9   agreements were negotiated using this $1.25 to $1.50 benchmark.

10  And if you look at the numbers in those settlements, the

11  numbers are not -- it's not some cookie cutter.  There's one

12  for 212,000, there's one for a hundred, there's one for 200,

13  there's one for 20, there's one for 15, they're all over the

14  place, and the reasons why -- why the numbers change is because

15  the sworn testimony shows because different Defendants had

16  different sales.

17          And I'm -- I'm sure the Court appreciates -- I have

18  one of these webcams with me.  You just don't see them very

19  much anymore.  People's sales were dropping.  We acknowledge

20  that.  And -- and so some Defendants just didn't have that much

21  sales, and so they paid small numbers.  That's how the system

22  should work.

23          And as -- as Judge Davis said, there's no minimum

24  number for a patent case, and there's a case out of California,

25  Site Update, that says the same thing, where they had -- where

1  there were 285 cases, and the Defendants said, well, the

2  numbers were small, that proves that the case must have been

3  frivolous, and they just don't.  Those Courts have

4  acknowledged, and I think that's a correct conclusion.

5          As the case proceeds, we get a Markman order, and the

6  evidence before the Court -- the sworn evidence is that

7  AdjustaCam dropped 16 webcams from the case.  Far from being

8  oblivious to the Court's Markman order, AdjustaCam trimmed its

9  case appropriately, we say, with -- with the assistance of its

10 expert.

11         As the case proceeds, now we get into July of 2012, so

12 all of the Defendants -- so now we're into expert reports, and

13 the -- the allegations of the Defendant is, well, AdjustaCam

14 never intended to pursue this case.  Well, the facts showed

15 just the opposite.  We went all the way through experts and are

16 cruise -- cruising along to trial when ultimately unfortunately

17 the -- the patent is derailed by the Patent Office.

18         So -- but the significance is Sakar, the one Defendant

19 here -- and Mr. Sutton is not here -- and I think -- and I -- I

20 can't question that he's stuck in New Jersey.  I will say Sakar

21 didn't participate in the Markman hearing in this case.  He

22 joined by case.  He didn't participate in the oral argument in

23 this case.  He was chastised by his -- his co -- his -- his

24 co-Defendant, Newegg, to the Federal Circuit for copying their

25 brief without permission, and I think the record is very clear

1  that Sakar has ridden coattails throughout this case, and, in

2  fact, as the case proceeded, it didn't even bother to designate

3  a damages expert.

4        So -- and that's significant, and I'll tell you why,

5  because it explains why Newegg exited the case.

6        So along the way, as this case proceeds, what -- what

7  Judge Davis, I think, appreciated was that these Defendants

8  that are settling out are manufacturers of webcams.  So -- and

9  as the manufactures settle out, the damages and the cases

10  against their -- their downstream retailers, they -- they

11  become de minimus or even go away.  That's -- that's the way it

12  should work.  Those -- those webcams are exhausted.

13        So we get into August of 2012, Gear Head and HP, who

14  are the last manufacturer Defendants, except for Rosewill,

15  who's -- who's -- which is Newegg's house brand, and except for

16  Sakar which sells these Kodak webcams, they settled out.  So

17  now the case really has changed.  The last manufacturers have

18  finally settled.  So all we have left are retailers.

19        So what did AdjustaCam do?  It -- it dropped Best Buy,

20  Frys, Micro Center, Office Depot, and Walmart.  Did it -- did

21  it shake them down for nuisance value settlements, as we've

22  been accused of doing?  No.  We said, your -- your -- your

23  manufactures have settled, your sales are now exhausted, you

24  may go.  We did exactly what the Court would expect us to do.

25  Their manufacturers settled.  Their webcams were exhausted.

1          The same thing happens with Newegg.  Newegg -- the

2    damages against Newegg at that point were -- were de minimus.

3    The record shows that they were -- the -- the damages were

4    about $17,000.00.  So -- so we're looking at having a patent

5    trial in this court -- or in Tyler at the time over $17,000.00.

6          And so we have two Defendants left.  One has 20 times

7    the damages and doesn't have a damages expert and has been

8    riding the coattails the entire case.

9          So it -- it was at that point, yes, Newegg was

10   dismissed in favor of their co-Defendant, who had no damages

11   expert and who had 20 times the damages exposure, and it just

12   didn't make sense to keep Newegg in the case after -- after

13   Gear Head and HP had settled, both of whom had supplied Newegg.

14         And so Newegg wasn't dropped because of some weakness

15   in the case or some skittishness by the Plaintiff.  Newegg was

16   dropped for legitimate reasons that are practical and sensible,

17   and I think the Court would expect litigants to make practical,

18   sensible decisions, just like -- just like dismissing these

19   other retailers.  They -- they were all glad to be dismissed

20   because their manufacturers took care of the issue for them.

21   Newegg took it differently.

22         So after the Newegg dismissal, the case -- the case

23   was supposed to go to trial against Sakar.  Unfortunately,

24   after two years of re-examination proceedings, the results came

25   back, and the PTO put AdjustaCam into -- the record shows and

1   the sworn evidence, they put them into a situation -- when --

2   when the re-examination claims come back and they reject them,

3   you can either -- and they allow new claims, you can either

4   take the new claims and move on, or you can appeal.  And the

5   record shows that an appeal of that would have very likely

6   exhausted the life of the patent.

7          And that -- that wasn't a sensible proposition for

8   AdjustaCam, including because AdjustaCam was involved in

9   arbitration proceedings against the largest license --

10  licensee, Logitech, who's continued to pay royalties under this

11  agreement all this time, not just some sham agreement, some

12  sham patent, a very significant licensee, the biggest player in

13  the market continued to pay royalties this entire time.

14         So once -- once the claims have been canceled, the

15  only thing you can do is dismiss the case.  That's the only

16  thing you can do, because those were the asserted claims.

17  Those were the claims in the infringement contentions.  You

18  can't continue the case at this point past experts.  So Sakar

19  was dismissed, too.  So Sakar wasn't dismissed because the

20  infringement claims lacked merit.  It wasn't dismissed because

21  this case was frivolous.  It was dismissed because the --

22  because the re-examination was unsuccessful and because

23  AdjustaCam really didn't have a choice to appeal it because it

24  just -- it would have exhausted the patent.

25         THE COURT:  Slow down a little bit, Mr. Edmonds.

1          MR. EDMONDS:  Yes, Your Honor.

2          So that almost takes us to the end of the case until

3     we get here.  So we had the same proceeding in front of Judge

4     Davis.  And the significance we see is that -- that Judge Davis

5     was -- was well in touch with this -- with this case.  He -- at

6     the very beginning of this case, he called in a status

7     conference and had the Plaintiff submit its settlement

8     agreements so he could take a look and see -- and see what this

9     case was about.  And we didn't get any further comments after

10    that.  And we had -- we had -- the entire basis for the

11    settlement metric in this case were licenses that were

12    negotiated arm's length, years before, in which running

13    royalties had been paid, in fact, millions of dollars of

14    running royalties had been paid.

15         THE COURT:  Let me ask you the same --

16         MR. EDMONDS:  Yes.

17         THE COURT:  -- question I asked Mr. Craft.  Given that

18    the Federal Circuit was aware that the Brooks Furniture

19    standard had been set aside and that the Octane decision from

20    the Supreme Court was in place and the guidance it provided was

21    in place, how do you believe that this Court should properly

22    construe and react to the language in the Federal Circuit's

23    opinion that says we decline to substitute our judgment for the

24    judgment of the district court, but we think the Defendant

25    should win in essence?

```
 1              MR. EDMONDS:  Well, we --
 2              THE COURT:   Am I supposed to ignore that, or am I
 3    supposed to be bound by that, or something else?
 4              MR. EDMONDS:  I -- I don't think you should ignore it,
 5    but you're not -- no.  This -- the -- the -- Octane says that
 6    it's -- it's this Court's discretion.  It's an abuse of
 7    discretion standard, and so it's -- the problem with the
 8    Federal Circuit's comment was -- and they -- they were invited
 9    by Newegg to just reverse and render.  They declined that.
10              THE COURT:  Didn't Newegg argue there that even under
11    the Brooks' standard, they should find that this was an
12    exceptional case?
13              MR. EDMONDS:  They -- they argued under Brooks, it's
14    an exceptional case, under Octane, it's an exceptional case,
15    and one of the justices said you just don't want to go back
16    before Judge Davis because you know he's not going to grant an
17    exceptional case motion, and -- and my recollection was
18    Mr. Frenkel recanted and agreed.
19              So yes -- but, I mean, it is -- it is this Court's
20    discretion.
21              THE COURT:  Put yourself in my place.  How am I
22    supposed to make a decision with that kind of -- I won't call
23    it guidance, but at least editorializing from the appellate
24    court.
25              MR. EDMONDS:  Well, it's -- you know, it's -- the
```

1   decision says at the very top non-precedential.  And I think

2   that the difference between your seat and their seat is that

3   you get to see all the facts and circumstances, you get to see

4   the credibility.  You can see we -- we brought our experts here

5   as a resource in case you wanted to hear them.

6           So, you know, they -- the appellate court gets a very

7   limited review of this based only upon those pieces of paper

8   that get designated for the record.  In this case, they

9   remanded it.  They didn't take up the record.  So it's not --

10  you know, they -- they -- it's just not entirely clear exactly

11  what facts they looked at, exactly what facts they thought were

12  persuasive.  It's certainly clear that Judge Davis, who -- who

13  wrote a reasoned opinion and who certainly looked at all the

14  facts, came to his own conclusion which was diametrically

15  opposite of their comment.

16          So it seems to me that the bottom line is, it's --

17  it's the Court's discretion, they're not going to substitute

18  it.  And I -- and I don't -- I don't think that they're -- I'm

19  not aware there's even been a reversal yet post Octane, because

20  it -- it is an abuse of discretion standard, and it's based

21  upon all the circumstances, and it's really this Court's

22  decision to -- to make.  It's largely -- people appeal it,

23  Newegg has appealed it, but it's --

24          THE COURT:  So even without the benefit of the entire

25  trial record and without the experience of having handled the

 1    case at the trial level, when the Federal Circuit says

 2    Defendants' arguments appear to have significant merit, I

 3    should just say, well, that's just somebody else's opinion, and

 4    don't factor that into my decisionmaking and decide this as if

 5    that comment had never been made?  That's exactly -- that's in

 6    essence what you're telling me?

 7              MR. EDMONDS:  I'm telling you this is your discretion

 8    based upon the facts and circumstances, and that's exactly

 9    right.  The Federal Circuit is not entitled to tip the scale.

10    That is intruding upon your province as a district judge.

11              THE COURT:  All right.

12              MR. EDMONDS:  And I -- and I don't -- I don't read

13    their comment as saying -- they prefaced it by saying we're not

14    going to do that.  So...

15              THE COURT:  Well, it somewhat appears that it gives

16    with one hand and takes away with the other hand.  But

17    nonetheless, it is what it is.

18              MR. EDMONDS:  It is what it is, Your Honor.

19              THE COURT:  What else do you have for me, Mr. Edmonds?

20              MR. EDMONDS:  All right.  And -- and lastly, you know,

21    the Logitech settlement -- you know, so Logitech -- and the

22    Federal Circuit, by the way, didn't have this.  So now you

23    have -- you have evidence they didn't it.  Because at the time

24    this -- the record was essentially closed in this case, there

25    was no record of Logitech because Logitech was -- was just a

1    different proceeding.  So now we've updated the record for this

2    Court's benefit against these accusations that these are just a

3    bunch of tiny nuisance value cases, and here's this Page 12 --

4    Attachment 12 that we say somehow says that their numbers don't

5    match up.

6          Logitech has paid $3.8 million, that's not nuisance

7    to -- to anybody, and that's a unit royalty on a real license

8    on a real patent, which is what we've considered this case to

9    be all -- all along.

10         May I go to the next one?

11         That's -- that's the timeline.  So -- okay.  It works.

12         Okay.  So just some points here.  So, again, the

13   dismissals were made -- Newegg was dismissed because its

14   suppliers settled out, and at the time of that settlement,

15   it -- the damages were very small.  And at the time, Newegg was

16   the only expert with a -- the only party with a damages expert,

17   and Sakar had 20 times the damages.

18         You know, they -- they say, well, the re-examination

19   was unsuccessful.  The re-examination lasted for two years,

20   and, ultimately, every piece of prior art was knocked out in

21   the re-examination.  That's what the record is.  And ultimately

22   one word was added to the claims to get them allowed.  The word

23   "permanently" was a added to get them allowed.  So it's not

24   like this was some clearcut, oh, it was hopeless.  It lasted

25   for two years, and ultimately it came very close to -- to

 1   getting passed on, but one word got the claims passed on.

 2           And, again, there were good questions to -- to do

 3   that, because AdjustaCam -- AdjustaCam was collecting ongoing

 4   royalties from -- from Logitech all while this was going on.

 5   Even after this case had been going on, even after the claims

 6   had been canceled, but AdjustaCam needed to get claims allowed

 7   to try to keep the royalty -- its royalty stream going.

 8           THE COURT:  Let me ask you this.

 9           MR. EDMONDS:  Yes.

10           THE COURT:  And, again, I'm going to ask you to slow

11   down.

12           MR. EDMONDS:  Sure.

13           THE COURT:  It seems to me the real issue here the

14   conduct of AdjustaCam post the Markman order.  In light of the

15   Markman order, was it -- was the conduct of AdjustaCam to go

16   forward with the litigation in light of the Markman order

17   meritless and such that would put this in the category of an

18   exceptional lawsuit, because clearly in light of the Markman

19   order, there's significant problems with the lawsuit.

20           So from the Plaintiff's standpoint, how do you justify

21   not folding your tent, for lack of a better phrase, as soon as

22   the Markman order comes out?

23           MR. EDMONDS:  All right.  So -- so -- and -- and -- I

24   mean, that's one thing I think that we concur on, really where

25   their -- were their alligations lie -- if I can get another

1    one, this thing doesn't work -- is -- is with this issue of

2    the -- of the claims.

3           So -- so we'll get the Court -- and so these claims

4    are fairly straightforward.  So Claim 1 here we're looking at

5    is the -- the hinge member is rotatably attached to the camera,

6    and it rotates about a first access of rotation.  That's the

7    claim language.  The -- the next here is about the -- the

8    second axis, but they've only challenged this first axis.

9    That's all they've challenged is the connection between the

10   hinge member and the camera.  That's what their entire argument

11   boils down to.

12          So if you go to the next one.

13          THE COURT:  As I understand it, the accused products

14   operated with a ball and socket-type application, and --

15          MR. EDMONDS:  Some do.  Sakar's actually don't.  I

16   don't know why -- you know, like I say, Sakar just seems to

17   copy off -- and not Mr. Craft.  He just appeared this week.

18   I'm not -- I'm not commenting on him at all.  He was asked to

19   come in at the last minute.

20          But Sakar has done such a hack job of copying Newegg's

21   briefs that they say ball and socket, but if -- if you look in

22   the evidence, they don't even have a ball and socket.  They

23   have a disk.

24          But the -- the -- I'm holding up one in my hand.  And

25   it's -- it's in the record.  You can see pictures of it.  And

1  it has this -- has this channel in it.

2       So if we look at this webcam, here's the fundamental

3  difference between the parties, and it has to do with -- with

4  the import of this Markman order against these devices.  This

5  device in my hand, the camera is clearly attached.  Nobody's

6  arguing that it's not attached.  It's clearly attachment

7  attached.  So I rotate this camera, and I rotate it -- you call

8  it panning.  You pan a camera left and right.  I'm panning that

9  along a single axis.  I -- I'm doing that right in front of the

10 Court.  The record shows it is done; it can be done.  We say

11 the claim is satisfied there.

12      So when you look at the Markman order -- and I'm

13 showing you the language from the Markman order -- Judge --

14 Judge Love, and he was -- he was affirmed by Judge Davis, you

15 know, he said that the proposed construction restates what's

16 already contained in the claims.  We agree.  We agree.

17      And the fundamental difference between the parties

18 is -- if you got the next slide -- you can go to the next one.

19 This is just Judge Davis' order.  The fundamental differences

20 between the parties is does -- is -- is Judge Love saying that

21 it's limited to a single axis of rotation in every

22 configuration of this webcam, in ever -- in every instance of

23 this -- in every configuration, or can I have an infringing

24 configuration, and can I have other movements that are in

25 addition to what infringes?  That's -- that's the fundamental

```
 1    difference.
 2            So what we have here is we have these displacements in
 3    rotations.  And that's one of the things our experts could --
 4    is -- would answer questions about if the Court wanted
 5    information on that.
 6            If you go to the next one.
 7            But the expert -- the thing to look at, I think, is
 8    look -- look at the preferred embodiment is what we're showing
 9    you here.  So these are pictures actually from -- we've taken
10    one from the patent.  As you can see, and -- and so we -- we've
11    modified it to where the webcam can tip, which is what it's
12    intended to do.  The preferred embodiment webcam in the patent,
13    yes, it has a single axis of rotation, and -- and that is the
14    first axis, but that first axis can have a different tilt.
15            And that's what -- what Newegg and Sakar are saying
16    are is, well, that axis can only have one tilt, and we say, no,
17    if -- that -- we don't read Judge Love's order to say that.  We
18    didn't read it to say that.  We didn't read it to say that in
19    every configuration, it had to be exactly the same.
20            And -- and the problem with their read of it is -- and
21    that's why we asked it to be reviewed, was -- but we couldn't
22    because we dismissed the case -- was that if -- if you read it
23    the way they're reading it, which I think is beyond the
24    language of Judge Love's order, then it's -- would seem to
25    exclude the preferred embodiment.
```

1          If you go to the next one.

2          And, again, these are figures directly from the

3   patent.  As we can see, at -- this -- this preferred

4   embodiment, it has -- it has -- it's a different -- it's a

5   different -- there are different axes here.  There are

6   different vectors here, just -- just like the accused webcams,

7   just like the accused webcams.

8          THE COURT:  Well, let me say this, counsel, I hear

9   your argument, but it almost seems to me as if you're inviting

10  me to revisit the claim construction issue.  And I don't think

11  that we're here for me to revisit and perhaps agree or disagree

12  with the judges that have previously ruled on claim

13  construction.  I think I'm bound by the claim construction that

14  we've got.  And I'm bound by the construction of that and the

15  evaluation of that by the Federal Circuit in their order that

16  included this remand.

17         If we were starting from scratch, I might agree with

18  you.  I don't know.  But I don't think I have that prerogative

19  at this point.  We're not here to change the record.  We're

20  here to look at the record as a whole as it exists and to make

21  a determination within the totality of those circumstances

22  whether this is an exceptional case or not.

23         So while I understand what you're arguing, I'm --

24  I'm -- I want to make it clear to you that I'm not interested

25  in reopening or revisiting claim construction ab initio.

1          MR. EDMONDS:  And that's -- and we're not inviting the

2     Court to do that, so thank -- thank you for those -- those --

3     for saying that.

4          What -- what I'm getting to is Judge Davis, and

5     he's -- and this is Judge Love's opinion, but it was Judge

6     Davis who ultimately adopted it, you know, his conclusion was

7     you could reasonably argue that the products meet the rotate --

8     rotatably attached limitation.  So that -- that's what I'm

9     trying to communicate to the Court that the parties seem to

10     have an disagreement over whether they meet the rotatably

11     attached limitation as -- as construed by Judge Love.

12          Judge Davis, we believe, got it right by saying that

13     you could reasonably argue the products did meet that

14     limitation as construed.  And that's what I'm trying to point

15     out to the Court.

16          THE COURT:  And I understand your point, and with

17     reasonable minds coming to different conclusions over the same

18     facts, that, I'm sure, is offered to persuade the Court that

19     that's not an exceptional situation.

20          MR. EDMONDS:  No, that's not exceptional.  And in

21     every case, the parties disagree.  You know, here -- here's

22     another example, everyone knows the earth rotates on its axis.

23     It's a single axis rotation, but the earth's axis isn't always

24     the same, it can shift.  It's still a single axis.  It's just a

25     single axis at any given time, which is exactly the theory

1    here, which Judge Davis found was reasonable.

2           So -- and I think the other thing that the -- the

3    Federal Circuit -- that we tried to explain more in the

4    declaration than -- than we had -- because the way -- the way

5    it worked before was the expert had a report, and then really

6    after the fact, Newegg and Sakar really attacked this issue,

7    and so there really wasn't that much of a record for it in

8    front of Judge Davis and ultimately the Federal Circuit.  So we

9    supplemented that record with -- with the declarations to try

10   and provide some additional explanation as to where this --

11   where -- where we were coming from on these issues.

12          And I think one of the good analogies is -- and it's

13   explained in Dr. Muskovitch's declaration, which is Exhibit 4,

14   is -- is your elbow.  And so your elbow has its -- some people

15   think, well, that's just an elbow, but it's not.  You have two

16   co-located joints.  My elbow can flex like I'm curling a bar

17   bell, and then there's another joint that can turn, so I can

18   turn my wrist like you turn the camera of a webcam.

19          And that's -- that's very much like the situation we

20   have here, where we have -- we have a joint at -- at a certain

21   point in this webcam, and that -- and that joint would be just

22   like your elbow joint that I can turn my hand and -- and -- and

23   pan my hand like panning a camera.  And -- and there's -- that

24   is a scientific fact.  And there's -- it's a reasonable

25   approach to this.

1          What they're saying is because I can move my elbow and

2     curl a bar bell, then that means that I wasn't -- that it

3     doesn't go in a single axis when I'm turning it into a single

4     axis.

5          And what our expert is -- is trying to explain, and we

6     did it with more -- we've given you, I think, more -- more

7     reasoned explanations in our declarations than -- than the

8     Court had before.  And that's part of what's different about

9     this case because the record just wasn't that well developed

10    because basically what we were presenting to the Court at the

11    time was just -- was a report which didn't address the issue at

12    all because it hadn't been contested.  And then the expert

13    being asked about it at his deposition.

14         Here our expert has tried to sum things up for Court

15    so it could be clearer.  And what -- what is clearer is that as

16    an engineer, one of ordinary skill in the art understands that

17    you have an independent behavior.  It's a separate behavior.

18    And the fact that this -- that this webcam can -- can tilt

19    is -- that is an independent behavior -- engineering

20    independent behavior than the fact that it can pan.  And that's

21    why it satisfies this claim, and that's why it doesn't violate

22    the Court's order, because it does rotate about a single axis

23    of rotation.  As our expert has explained, the axis of rotation

24    of this camera is always going to be at -- at a -- around a

25    single point on a single -- it's always going to be around a

1    single point.

2          So these are separate behaviors.  That's what we've

3    tried -- I think -- I think that's what Judge Davis -- because

4    we had -- you know, significant amount of time on this in front

5    of him, and I think that's what he -- I think that's what he

6    comprehended, and I think it's a very important point, and it

7    may just be a point the Federal Circuit didn't get because of

8    the limited record before them.

9          But it's a separate behavior, and that's why the claim

10   element -- that's why there's no violation of the Markman order

11   and why the claim element is met.  And this is -- this is from

12   an engineering perspective from one of ordinary skill in the

13   art.  There's -- there have been no declarations from their

14   experts.  There's been very, very little from their experts.

15   In fact, it's basically their -- their case is based upon

16   attorney argument.

17         So, you know, I think what -- what also I think we

18   showed Judge Davis at the last hearing was just how very

19   similar their webcams are to the preferred embodiment.  And,

20   again, we're not asking you to revisit claim construction, but

21   we are asking you to take heed of Judge Davis' conclusion which

22   was correct that our position was -- was reasonable.  They're

23   very similar.  They have -- they have the same range of

24   movement.  They're very similar.

25         And then I can -- a couple things that the Federal

1   Circuit also didn't have that I think are important -- oh,

2   by -- this -- this -- by the way, you asked about balls and

3   sockets.  These are Sakar's webcams.  There's no ball there.  I

4   don't -- I don't understand why they keep saying that.  In

5   fact, we pointed out at the last hearing on this that there was

6   no ball there, and they just -- they keep resubmitting the same

7   briefs.

8           What -- what -- one thing the Federal Circuit didn't

9   have either was the discussion now about the Dovey patent.  So

10  the Dovey patent is in -- is in the Defendant's invalidity

11  contentions.  So, in other words, they -- they claimed that it

12  meets the claim limitations.  And as we can see, the Dovey

13  patent has a ball joint.  By -- by -- by Newegg's theory, if

14  its theory is that AdjustaCam is frivolous because our webcams

15  have a ball joint, then their invalidity contention was

16  frivolous, too, but I submit to you that neither was frivolous.

17  That this -- Dovey was not an invalidating reference for other

18  reasons, but I don't see how a Defendant can come in here with

19  a straight face to the Court and say they're frivolous.  This

20  case is exceptional because they pointed to an infringing

21  device with -- that had a -- that had a ball and socket joint

22  when, frankly, first of all, it's a constrained ball and socket

23  joint, it has a different behavior from an engineering

24  perspective, but, moreover, their invalidity contentions have

25  an invalidating device that had a ball and socket joint.  I

1    think that alone weighs heavily in favor -- or against what

2    they're trying to sell the Court here today.  This wasn't in

3    front of the Federal Circuit even.

4         What I'd also point out, and this wasn't in front of

5    the Federal Circuit either, is that -- and they only have a

6    handful of references.  There's like five prior art references.

7    We're not talking about we picked 1 out of 50.  So one of them

8    is Dovey.  It has their own invalidating -- allegedly

9    invalidating reference, has a ball joint.  The other is Ma.

10   And what do we see with Ma -- so the red part is what they --

11   the record shows, the red part is what they call -- the hinge

12   member, and the camera is the thing up here that has the lens

13   on it.  And as you can see, the camera rotate on -- on two

14   axes.  But in their invalidity contentions, they just point to

15   one of -- one of the axes and say, well, the claim's satisfied.

16        Well, that -- that's very similar to the infringement

17   contentions.  It's frankly not surprising that the parties to a

18   case that the infringement theories and the -- and the

19   validity -- invalidity theories on -- on certain elements are

20   in sync because both parties were operating on what they

21   understand the claim element to mean.

22        And I don't -- I don't think Newegg was being

23   frivolous when they made this invalidity contention.  What I

24   say is that neither side has been frivolous in saying that

25   there's an independent movement, then that doesn't take

1  something outside of the claim construction.  And if it did,

2  then the Court -- under the totality of the circumstances, I

3  think Court would look and say, well, the Defendants did the

4  same thing.  What's my totality there?  And they were advancing

5  the same -- the same theories that now they claim are

6  frivolous.  How can they be frivolous?

7         So, again, to these settlements, so -- so the

8  allegation is that -- so -- so, yes, we -- we -- we agree that

9  the touchstone of this is the merits of the case.  Now, what

10  the Defendants have tried to do is they've tried to say -- to

11  bootstrap -- what I would say bootstrap by saying that, well,

12  AdjustaCam has all these -- these excuses, and their experts

13  seem to be behind them, but we disagree.  But just look at the

14  settlements, and since the settlements were low -- since some

15  of the settlements were low, then -- then that -- then that

16  they shows that they must be wrong on the merits.

17         But, you know, the -- that's why I took you through

18  the timeline.  The very beginning of this patent, before it

19  even came to AdjustaCam, there was a royalty of $1.25 a unit

20  for the first two million.  And then very soon thereafter,

21  there was another -- if you could advance that for me.  Oh, I'm

22  sorry, this is -- this is -- this is the -- Slide 18 here is

23  the -- is the evidence -- some of the evidence I was talking

24  about.

25         So this is sworn testimony -- on the left-hand is from

1  our 30(b)(6) designee who is under oath.  On the right-hand

2  side is -- on the left-hand side, it's him saying I'm a

3  designee.  On the right-hand side are excerpts for the

4  deposition, and this is -- this is in our -- in our response of

5  where he -- he's saying it was tied to a target royalty.  Now,

6  they had a chance to test that.  They had a chance -- their --

7  their damage expert didn't talk to any other Defendants.

8  They -- they -- they didn't depose anybody but -- but our

9  people.  So they come into Court now speculating, oh, well,

10  they're just lying.  They just made this up.  They're -- the

11  numbers just can't match up.  But that -- but that's just not

12  the facts.

13        The evidence before the Court, which is what the Court

14  should be considering, is that -- that these settlements had --

15  were tied to a target royalty, and they're reasonable, and the

16  low size of the settlements has to do with low sales, and you

17  shouldn't read anything about the merits into the case into

18  that.

19        THE COURT:  All right.  What's your next point?

20        MR. EDMONDS:  Yes.  We're -- we're -- and I appreciate

21  the Court has lots on its docket, so we're going to wrap up

22  here.

23        I want -- I wanted to wrap up with our last slide

24  here, and then I'll answer some of the -- yeah, to the -- the

25  royalty.  So -- the one before the royalties.

1          Yeah, so -- so these are the unit royalties paid by

2     Logitech on this patent, almost $3.8 million.  They continue

3     paying royalties, and there are actually more paid.  As you can

4     see, there's a gap.  As the record shows, some of the royalty

5     reports were lost.  But they're -- they continue to pay

6     substantial running royalties throughout -- throughout the

7     pendency of this case.  This is not just some nuisance here.

8          And I just point out -- if you go to the last slide --

9     our damage expert has pointed out multiple flaws in this

10    so-called Attachment 12.  In our damages expert's declaration,

11    he's pointed out multiple flaws in this so-called Attachment 12

12    for which you've been given no backup and for which the

13    Defendants have just been -- have just asked you to -- asked

14    you to accept this.

15         So that's really what this case is about.  I would --

16    I would also just address the issue of waiver because I think

17    they danced around it.  The issue we raised was that they did

18    not allege any clear error in Judge Davis' factual finding.

19    And what I -- what I heard my -- my brother say was did --

20    was that he danced around the issue and said that clear error

21    must be inherent in -- in the exceptionality, and so we kind

22    of argued it, but in reality, they didn't argue it.  There is

23    no -- you look -- that's why we included their entire brief

24    as an exhibit because they didn't argue there was clear error

25    in -- in Judge Davis -- Judge Davis' fact -- factual findings

```
 1   because there -- because there isn't.  He think his factual

 2   findings were correct and had substantial support.

 3          So I think that that -- what if the Court finds

 4   waiver, what you might -- one approach would be what -- what

 5   Newegg experienced not too long ago in -- in the Northern

 6   District in the Site Update case was the same -- a very similar

 7   situation.  The case was remanded post Octane in front of Judge

 8   Grewal.  Judge Grewal reheard it.  He heard the issue of

 9   waiver.  He said I'm going to table waiver because you've still

10   fallen short, and he denied their motion again.

11          So that's -- you know, that -- so -- but I think you

12   should --

13          THE COURT:  So, in other words, you'll take a win any

14   way you can get it?

15          MR. EDMONDS:  Well, that -- right.  I don't think you

16   have to find -- like Judge Grewal, I don't think you have to

17   find waiver because they've fallen short, but I don't see -- I

18   mean, the remand rule and the waiver rule would say -- in our

19   view, once they filed their appellate brief, and they didn't

20   allege clear error in Judge Davis' factual findings, there's

21   just no way to challenge those.  And -- and what's remanded is

22   what was appealed.

23          THE COURT:  I understand your argument.

24          MR. EDMONDS:  Yeah.  So lastly, we just say look at

25   this -- the totality of the circumstances, and -- and
```

1    especially look at the evidence before the Court.  And I think

2    that's one thing that Judge Davis appreciated, and -- and -- is

3    that the sworn evidence from -- the evidence from -- from the

4    settlement agreements that have recitals -- settlement

5    agreements that were negotiated at arm's length that have --

6    that have running royalty provisions that have recitals for

7    additional royalty provisions, the sworn evidence from

8    witnesses of how those came about, the sworn evidence from the

9    declaration from our technical expert with very reasoned --

10    well-reasoned opinions as to why -- as to why this infringement

11    theory is valid -- I haven't heard them anything about

12    invalidity in this Irifune patent, so I don't think we need to

13    comment on it, but I'll comment on it in just a moment, because

14    they've -- they've raised it twice now, and may -- maybe since

15    they didn't argue it, maybe they don't think it means very

16    much.  But they --

17              THE COURT:  Let me go --

18              MR. EDMONDS:  Yes.

19              THE COURT:  -- back to the -- the license issue

20    with -- with you for just a minute.

21              What's your response to the argument that, yes, these

22    licenses provide for a running royalty, but they're

23    intentionally structured such that you never get to the running

24    royalty, and they're, in effect, a lump sum because the number

25    of units beyond the initial payment to trigger a future running

```
 1   royalty is so high that the reality of it was they would have
 2   never gotten there anyway?  What's -- what's your response to
 3   that?
 4           MR. EDMONDS:  Well, the example they gave -- now, the
 5   response is, is that that -- that's inaccurate.  So there --
 6   there were some -- some licenses --
 7           THE COURT:  I don't expect you to agree with me.
 8           MR. EDMONDS:  No.
 9           THE COURT:  But tell me why you don't agree with me.
10           MR. EDMONDS:  Well, I won't agree because -- because
11   the facts in the testimony were for those six -- and it's
12   actually seven licenses because there was one --
13           THE COURT:  And, again, counsel, you're going to have
14   to slow down a little bit.
15           MR. EDMONDS:  Sorry, Your Honor.
16           THE COURT:  I'm trying to follow you, but you're
17   awfully fast.
18           MR. EDMONDS:  Okay.  Thank you, Your Honor.
19           So with these settlement agreements, the testimony was
20   that they weren't likely to reach that threshold, but -- but
21   the basis for achieving that threshold was the $1.25 to $1.50
22   per webcam, and that's what distinguishes them from another
23   tranche of settlements to where they set it higher, and said we
24   are probably just not going to reach it.  We don't have to have
25   this $1.50 if you exceed it.
```

1        So the -- the evidence was that for those Defendants,

2   they -- they thought you -- you were likely not to reach this

3   threshold, but -- but you might, and if you do, then we'd --

4   we'd agreed that it's $1.50, which was consistent with the

5   discussions that got them there.

6        For another tranche of settlements, which are

7   discussed in the Bratic report and the Bratic declaration,

8   those -- those Defendants didn't want to pay running royalties.

9   And as the Court probably knows, running royalties are not

10  ideal.  There's -- there's enforcement problems, there's audit

11  problems.  They're not ideal.

12       Those Defendants set it high enough to where it was --

13  it was rationally based upon the target, but that -- that

14  should take care of them through the life of the patent.

15       And a good example of that would be -- would be

16  Newegg.  You know, Newegg had complained that, well, AdjustaCam

17  offered to settle for $51,000.00, but we had $17,000.00 in --

18  in -- in past sales.  And with the past sales, what you have to

19  understand is there was no marking by the licensees.  So the

20  past sales are just post suit sales.

21       But we showed mathematically that the -- the

22  $51,000.00 wasn't some arbitrary number meant to shake them

23  down, is that we took their past sales, took the number of

24  years left on the patent, and multiplied that and came --

25  that's how the number -- I mean, mathematically, the number

 1   matches up.  So we took the number and said, based upon your

 2   past sales, based upon where we think you're going, your sales

 3   are probably declining.  $51,000.00 is a good estimate based on

 4   $1.50, and we'd be willing to resolve the case for that.

 5   That's -- that's not a shakedown.

 6          So that -- that's the kind of thing they're talking

 7   about is, you know, reasonable parties getting down and saying

 8   you're going to have future sales, we're going to -- we're

 9   going to want to pay up this license.  Can we come to a number?

10   This is -- this is the number that we're dealing with.  It's

11   $1.25 to $1.50.  Let's come to a number where we can agree that

12   that's going to take care of you for the next three years

13   before this patent expires.  And that's what the evidence was.

14          THE COURT:  I understand your answer.

15          Let's -- let's move on to whatever points you have so

16   we can finish up.

17          MR. EDMONDS:  Yeah, our -- our -- my -- my last point

18   is they tried to discount the Logitech license.  If Logitech

19   didn't infringe, they wouldn't have paid $3.8 million.  So, I

20   mean, that -- that is the persuasive -- and Newegg has another

21   case that they took up to the Federal Circuit on -- on -- on

22   285.  It's called SFA versus Newegg.  It was another case in

23   front of Judge Davis.  And they made similar allegations of

24   improper settlement behavior, and -- and things like that.

25          And the Federal Circuit responded in SFA versus

```
 1    Newegg, and they said, Newegg, there aren't facts to back up
 2    your allegations.  And they also looked to a couple larger
 3    settlements that SFA had, and said, well, all their settlements
 4    aren't small, so you can't say all of them are small, and they
 5    found that persuasive, too.  So the Logitech license, I think,
 6    is significant and something the Federal Circuit just didn't
 7    have in front of it last time, so it's something significant
 8    you should consider.
 9            On -- on the validity issue, like I say, they didn't
10    argue it.  If the Court wants to hear on validity, I -- I'm
11    thinking it's -- they're throwing away that issue at this
12    point.  So, you know, unless they're going to bring it up in
13    their rebuttal, I don't think we need to waste the Court's time
14    on it.
15            THE COURT:  All right, counsel.  Thank you for your
16    argument.
17            MR. EDMONDS:  Thank you, Your Honor.
18            THE COURT:  Mr. Frenkel, let me hear your response.
19            MR. FRENKEL:  Thank you, Your Honor.
20            I think I'm going to start with the -- on the license,
21    Your Honor asked Mr. Edmonds to respond to my point that
22    AdjustaCam had structured these licenses because it was
23    unlikely that the limitations would ever be reached.
24            And, again, I'm reading right from Mr. Bratic's
25    report, we're -- I'm going to quote it here.  It says, I
```

1   understand that AdjustaCam utilized this royalty structure

2   because these licensees had a low volume of past sales, and it

3   would be highly unlikely that total volume sales would exceed

4   the units included in the lump sum payment.

5          We're not just making this up, Your Honor.  It's in

6   the record.  We're -- we relied on that.  I understand now that

7   AdjustaCam has put in two new declarations, which by the way,

8   Your Honor, I have to admit I didn't notice it.  Because

9   Mr. Edmonds' declaration, which he submitted with AdjustaCam's

10  opposition brief, doesn't mention them at all.  And I -- I see

11  now that he introduces Exhibits 1, 2, and 3, and then skips to

12  Exhibit 6.  And, evidently, these two new declarations were put

13  in as Exhibits 4 and 5.  And I'll go back and look at the

14  record and so can the Court.  But I -- I have to submit that

15  these new declarations should not be contradicting what was

16  already in the record before.  The Federal Circuit did remand

17  for reweighing, but it didn't remand to put in new evidence.

18         And this is -- Newegg is not seeking attorney fees --

19  I'm sorry, Newegg is seeking attorney fees for the period of

20  time that the litigation was -- was going on, and so all these

21  new arguments that weren't in the record before I don't think

22  are appropriate to consider.

23         THE COURT:  Well, as I said earlier, I don't intend to

24  reopen or revisit claim construction nor do I intend to disturb

25  the existing record, but I do intend to look at the complete

```
 1   record in determining from a totality of the circumstances

 2   whether this is or is not exceptional.

 3           MR. FRENKEL:  Thank you, Your Honor.  I think that's

 4   appropriate, so I'll move on.

 5           But I did want to address Your Honor's comments about

 6   whether -- and I think this was asked to Mr. Craft, whether

 7   one -- whether you should consider all of the licenses here.

 8   It is a pre-AIA case.  I'm not sure that it would be

 9   inappropriate to consider all the licenses in related cases in

10   the post-AIA world, but the fact is Your Honor doesn't have to

11   decide that in this case.

12           THE COURT:  That's why I asked for that point of

13   clarification.

14           MR. FRENKEL:  Thank you.

15           And then as for the Federal Circuit footnote, again,

16   that was -- that was asked to -- to Mr. Craft, and I did want

17   to give Newegg's view on that, and -- and I want to give some

18   context.

19           Newegg was seeking a reversal, and it wasn't

20   because -- and I know that one of the judges had -- had -- had

21   quipped at the oral argument that we were afraid of coming

22   back, and that's not -- that's not the case.  And as I pointed

23   out in the oral argument, which, again, it's on the record,

24   it's publicly available, that we didn't want to go back because

25   Judge Davis at that time had announced his retirement -- well,
```

```
 1    retirement from the bench to go to Fish & Richardson.  And I
 2    pointed that out to the judges, and I said we were concerned
 3    because the case was going to -- going to go back to another
 4    judge that hadn't sat through everything and hadn't seen the
 5    record.
 6            And so we thought it would be appropriate for the
 7    Federal Circuit to decide the issue.  They decided that they
 8    wouldn't, but they did put in the footnote, which we view as
 9    guidance, the footnote does not say Your Honor -- and I'll
10    concede that.  The footnote does not say that you must find
11    for Newegg.  If they had said that, they wouldn't have remanded
12    it.  But it did express the guidance based on the oral
13    argument.
14            All right.  On the issue of the settlement amounts
15    being too low, I think the point there is that, you know,
16    for -- for licensees that sold 130 units and ended up paying a
17    significant -- more amount of money than the $1.25 to $1.50, I
18    mean, if they really had wanted to have a licensing campaign
19    with a target royalty, those licensees would have paid 250
20    bucks.  But that's not what happened, and it's because the cost
21    of litigation is much more than the 20,000, $30,000.00
22    settlements that were achieved.
23            As for Newegg and why Newegg exited the case, again,
24    there is evidence in the record, and this is the Zarian
25    declaration, which is, I think, Exhibit 728, and it's
```

1    Exhibit 11 to that, this was something that Newegg produced on

2    November 9th, 2011.  Again, this is way early in the case.  And

3    it's documents showing Newegg's sales of products.  And it

4    shows that Newegg had roughly 14,500 sales of Rosewill

5    products.  Now, that's not an exact number, but it -- it is in

6    our brief.  It's at Page 11 of our opening brief.  And about

7    5,500 units of products other than Rosewill.

8         So Mr. Edmonds claims that they dropped the case

9    against Newegg later because there was exhaustion because other

10   manufacturers had settled out.  But in that -- in reality,

11   Newegg's own Rosewill home brand was what was driving the sales

12   from the beginning.  And when Newegg disclosed less than a

13   hundred thousand dollars of revenue in November of 2011, that

14   case was never dismissed, and it was the same amount of revenue

15   at issue -- or maybe a little less if some of the manufacturers

16   had settled out, but it was roughly the same amount of revenue

17   that was at issue later on when the case was eventually

18   dismissed.

19        All right.  Moving to the earth, Mr. Edmonds used an

20   analogy that the earth rotates around one axis.  I -- but it

21   can shift, the axis can tilt.  And that's not the point here.

22   Again, a ball and socket joint can rotate among several axes,

23   and the earth cannot.  It does not rotate among several axes.

24        THE COURT:  What's your -- what's your response to his

25   argument that if you're going to use a ball and socket to

1  defeat their infringement case, then you're stuck with it when

2  you offer it as one of your prior art references on your

3  invalidity case?

4        MR. FRENKEL:  Well, Your Honor, I'll -- again, I'll

5  have to go back --

6        THE COURT:  He's basically saying you can't have it

7  both ways.  So how do you respond to that?

8        MR. FRENKEL:  Well, first of all, again, this wasn't

9  in the briefing, Your Honor.  But we --

10        THE COURT:  Well, it's part of what I heard argued

11  today, so I want to hear the other side.

12        MR. FRENKEL:  Well, Your Honor, I'd -- I'd have to

13  go back and look at the invalidity contentions and how it was

14  argued that Dovey invalidated the patent.  I have to admit,

15  I -- I did not do that prior to oral argument today, so I

16  cannot do that.

17        We did brief the Irifune reference that Mr. Edmonds

18  raised.  I didn't raise it at oral argument, quite frankly,

19  because Your Honor can look at the briefs.  You know, the Ma

20  reference to me, again, may have been raised in -- in

21  Dr. Muskovitch's supplemental declaration, but it certainly

22  wasn't in the briefing.  Looks to me like it has one axis that

23  rotates -- it rotates around a hinge member on one axis, and it

24  rotates around the camera member on a separate axis, so I think

25  that's consistent.

```
 1              Dovey is the one that claims a ball and socket, but I
 2    actually can't even tell you one way or the other whether
 3    that's true --
 4              THE COURT:  All right.
 5              MR. FRENKEL:  -- as I stand here today.
 6              THE COURT:  All right.  What else do you have for me?
 7              MR. FRENKEL:  The -- just -- okay.  So two more
 8    points.  So on the waiver issue, you know, we did argue to the
 9    Federal Circuit, again, and that's in our brief -- in the reply
10    brief, we point out exactly where in our Federal Circuit
11    briefing that Judge Davis' order was based on clear error.  And
12    we pointed out that when deciding the fees motion, he ignores
13    his claim construction, and his reason why he felt that
14    AdjustaCam could prove infringement was because, you know, that
15    he ignored the fact that the claim construction said it was
16    limited to a single axis of rotation.  And those are the key
17    words, limited to a single axis of rotation.
18              That was clear error.  We argued it to the Federal
19    Circuit.  If the Federal Circuit hadn't found, they would have
20    reaffirmed.  If they didn't.  They reversed.  They remanded --
21    I'm sorry, they vacated and remanded, and that's why we're back
22    here.  So I think that there's no waiver.  And that's all I
23    have for you, Your Honor.
24              THE COURT:  All right.  Do you have anything further,
25    Mr. Craft?
```

```
 1              MR. CRAFT:  No, Your Honor.

 2              THE COURT:  Mr. Edmonds, I'll give you the final word,

 3      but I expect it to be very brief, if you want to take it.

 4              MR. EDMONDS:  Thank you, Your Honor.  I'll just --

 5      I'll just address the points you addressed with him.

 6              THE COURT:  I don't want to hear anything that I've

 7      already heard.  If you have something new, I'll -- I'll hear

 8      that.

 9              MR. EDMONDS:  I just want to clarify.  He said he

10      didn't understand Dovey.  If you look at -- their contentions

11      are -- are an exhibit to our -- to our brief, and it is

12      addressed in the Muskovitch declaration.  I thought it was

13      addressed in the brief itself.  It either is or it isn't.

14              But the point is they ignored -- they ignored the ball

15      joint.  They said the claim was satisfied, and they ignored it,

16      and -- and the reason they ignored the ball joint was because

17      they decided the claim was satisfied, and this -- and this

18      extra behavior that this device was capable of wasn't relevant

19      to their invalidity contention.

20              And that's -- that's very similar to what we've said

21      was the claim was satisfied and because there were these

22      independent movements from what an engineer would see as an

23      independent joint, then it's irrelevant.  And the same -- the

24      same thing with Ma.  They -- they just ignored that other --

25      that spinning structure, the shaft, it's just ignored.  It's
```

1   not mentioned.  It's not a structure that's mentioned in

2   their -- in their contention, and they ignored it because it

3   just wasn't relevant.

4       And that -- that's what we've been trying to

5   communicate to the Court that -- and -- and Judge -- Judge

6   Davis, who -- who he wasn't the author of the claim

7   construction opinion, but he was the one who -- who adopted it,

8   seemed to understand that that was a reasonable position to

9   take under the claim construction because you can have

10   independent joints with independent behaviors, and it's still

11   reasonable to say that we can look at the structures that do

12   satisfy the claim element.

13       And I'll leave it with that.  Thank you, Your Honor.

14       THE COURT:  All right.  Counsel, thank you for your

15   argument.  This matter is under submission.  I will attempt to

16   get you a ruling as soon as possible.  I'd like to make it

17   clear that there is a large record here.  The Court is

18   operating under circumstances where I was not the trial judge

19   who heard this before.  I've got to go through that record

20   thoroughly.  I expect that it may take some time to get you a

21   ruling, but I will -- I will move in that declaration as

22   expeditiously as -- as the requirements before me and the

23   docket that I have to see over will allow.

24       I do want to make this clear, if any party, including

25   Newegg, believes this Court is not acting within an appropriate

```
 1   time frame, then I'm directing you to seek a status conference

 2   with the Court before taking any other action so I will know

 3   that you are of that opinion.

 4          With that, this matter is under submission.  Thank you

 5   for your argument, counsel, and you are excused.

 6          COURT SECURITY OFFICER:  All rise.

 7          (Hearing concluded.)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          CERTIFICATION

2

3          I HEREBY CERTIFY that the foregoing is a true and

4     correct transcript from the stenographic notes of the

5     proceedings in the above-entitled matter to the best of my

6     ability.

7

8

9      /S/ Shelly Holmes                        4/1/16
      SHELLY HOLMES, CSR-TCRR                   Date
10    OFFICIAL REPORTER
      State of Texas No.: 7804
11    Expiration Date: 12/31/16

12

13

14

15

16

17

18

19

20

21

22

23

24

25